## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH DAKOTA
## WESTERN DIVISION

JOYCE RIGGS AND ALFRED RIGGS,

        Plaintiffs,

vs.

BENNETT COUNTY HOSPITAL AND
NURSING HOME,

        Defendant.

CIV. No. 16-5077-JLV

## Brief in Support of Motion for Summary Judgment

Defendant, Bennett County Hospital and Nursing Home ("Bennett County"), through its attorneys, Michael M. Hickey, Sarah Baron Houy, and Kelsey Parker, hereby submits this *Brief in Support of Motion for Summary Judgment.*

### Summary Request

For the reasons provided below, Bennett County respectfully asks the Court to enter an *Order* granting its *Motion for Summary Judgment* on the following issues:

1. Joyce Riggs is not disabled as defined in the Americans with Disabilities Act ("ADA");

2. Joyce's Riggs' claim for "Failure to Accommodate" fails as she cannot establish that the requested accommodation was "reasonable on its face";

3. Joyce's claim for retaliation under the ADA fails because filing for unemployment benefits is not "protected activity" contemplated by the ADA;

4.  Bennett County did not engage in extreme or outrageous conduct to warrant an action for intentional infliction of emotional distress; and

5.  Alfred's claims for retaliation fail because Alfred cannot establish that he engaged in statutorily protected activity and because Bennett County terminated his employment for a legitimate, nondiscriminatory reason.

## Factual Background

Bennett County is a hospital and nursing home located in Martin, South Dakota. Joyce Riggs ("Joyce") began working at Bennett County in 2006. JT 16:17-19;[1] Dep. Ex. 2.[2] Joyce's husband, Alfred Riggs ("Alfred"), was also employed by Bennett County as the Ambulance Director. AT 59:15-17; Dep. Ex. 63. Joyce worked as a Dietary Aide, Purchasing/Central Supply/ Account's Payable Clerk, Medication Aide/CNA, and an EMT during her tenure at Bennett County. JT 53-54; Dep. Ex. 4 and 5. Throughout her employment, Joyce received various reprimands for poor work performance, including: acting outside her scope of practice, unacceptable conduct, inappropriate communication with others, engaging in inappropriate behavior with a male nurse, and criticizing other staff members. *See eg.* Dep. Ex. 6, 7, 8, 10, 23, 44.

---

[1] Throughout this brief, references to the deposition transcript of Joyce Riggs will be referred to as "JT" and found in Exhibit 101, references to the deposition transcript of Alfred Riggs will be referred to as "AT" and found in Exhibit 102, and references to the deposition transcript of Ethel Martin will be referred to as "ET" and found in Exhibit 103.

[2] For ease in referencing exhibits in this matter, all deposition exhibit numbers have been referred to by their original deposition number. All non-deposition exhibits start at Exhibit No. 101.

Before Joyce's employment ended, she worked in Central Supply Monday through Friday, and worked on-call as an EMT for the ambulance. JT 54:11-14; JT 53:8-21. Some of Joyce's primary responsibilities in Central Supply included "receiving goods, stocking shelves, recording delivery of supplies, sterilizing all sterile supplies, and medical waste . . .". Dep. Ex. 5. Joyce was responsible for assuring that her work area was maintained in a clean manner, she was required to use the sterilizer machine, she prepared invoices, and was responsible for maintaining of inventory. Dep. Ex. 5. The Central Supply room is where all sterile patient supplies are maintained. Dep. Ex. 31. Joyce worked in the Central Supply Office with her supervisor, Katie Dillon ("Dillon").

Throughout her employment, Joyce regularly brought her pet dogs to work with her, namely: Katie (a Catahoula), Peabody (a mini Dachshund) and Cheikah (a Dalmatian/Bluetick Coonhound). JT 62-63; Dep. Ex. 61; AT 13:13-19. The dogs were rarely restrained and often urinated throughout the hospital and nursing home. Lynn Ward, a registered nurse, documented,

> As a floor nurse on the hospital side prior to my present position, I had many encounters with Joyce Riggs and her dogs in the facility. I had requested to Joyce that she keep her dogs out of the hospital side of the facility while I was working as I had numerous times cleaned up dog urine from the floor, and didn't feel it was appropriate in an acute care setting. The dogs were often found running in the hallway or down the passage to the nursing home. The dogs were seldom on a leash.

Dep. Ex. 61.

Jennifer Risse, RN/DON, also noted "there were a number of occasions where I witnessed Joyce Riggs bringing her dogs to work with her. The dogs

were never restrained and would run freely throughout the hospital." *Id*.

Risse, in a memo from 2012 wrote,

> [Cheikah] was friendly enough and some of the residents did enjoy her. The issue became that [Joyce] would not follow the policy and keep her dog restrained or out of the dining area. The dog would wander freely in and out of resident rooms and at times had an issue of getting excited and urinating on the floor. This was not only an Infection Control issue, but also a safety issue for our residents.

*Id*. Dillon detailed that there were multiple instances of issues with Joyce's dogs (Katie, Cheikah and Peabody). *Id*. Dillon cleaned up urine from all three dogs as well as bowel movements from Peabody. *Id*. Dillon wrote,

> One incident happened with the Catahoula (Katie) where she was afraid and voided on an upholstered chair down by the emergency / xray area. Joyce spent quite awhile shampooing upholstery that day. Eventually Joyce stopped bringing Katie because she was afraid to be in the building & would cower the minute she entered.[3]

Dep. Ex. 61. Alfred admitted, too, that Joyce's dogs were not always restrained, "there were some times I did not see a leash, but they were always with Joyce or they were – you know, may not necessarily be right beside her . . ." AT 10:7-11. On at least one occasion, Joyce's dog was eating food off of a plate from the dining room. JT 136-137. Lenny Allison,[4] the

---

[3] Alfred testified that Katie became fearful of the office Joyce was working in and "that could have been when she started bringing Cheikah more often." AT15:13-25.

[4] Joyce has a long history of hatred towards Lenny Allison. *See* Dep. Ex. 16. Admittedly, Joyce testified, "I had problems with Lenny Allison." JT 121:11. Joyce did not approve that Lenny violated the "no smoking" policy and failed to salt the side walk. JT 121:12-25. Joyce wanted Lenny to be disciplined because she did not believe it was fair that Bennett County was (allegedly) coming down on her for having too many personal items in her office and paying bills at work. JT 122:1-21. Joyce did not like going into the garage where Lenny worked because she did not

maintenance manager, upset about a dog eating food of a resident plate, yelled at the dog and kicked it. *Id.* Joyce and Lenny started screaming and swearing at each other in front of residents. ET 18-20. This incident prompted Jennifer Risse to request the implementation of a pet policy. ET 17-21.

In June of 2012, a *Pet Policy* was implemented.[5] *See* Dep. Ex. 11. The *Pet Policy* required pets to have vaccinations, pet owners were required to clean-up after their pets, pets were required to be restrained, and pets were restricted from certain areas at Bennett County (including clean supply storage areas). *Id.* However, this *Pet Policy* did not solve the problems Bennett County was having with Joyce's dogs. Dep. Ex. 61.

In August of 2012, Ethel Martin ("Ethel") became the CEO of Bennett County. Complaint, ¶11. As Joyce alleges in her *Complaint*, "[Ethel] did not approve of dogs being permitted to run loose throughout the facility." *Id.* In September of 2012, Ethel implemented a *Pet Visitation Policy.* Dep. Ex. 12. The policy only allowed pets to be at Bennett County for visitation purposes, restricted pets from the dining area, food preparation areas, laundry, supply storage areas, medication preparation areas, and isolation areas. *Id.* The *Pet Visitation Policy* required that the animals be vaccinated and be supervised at all times, including being restrained on a leash. *Id.* The policy was discussed and acknowledged by Joyce. Dep. Ex. 13. Joyce admitted these requirements were reasonable. JT 94:1-15.

---

like the smoke. JT 123:4-8. Joyce alleged that Lenny would make "crude comments" to her when she would go to the garage. JT 155:12-20.

[5] Apparently, no pet policy existed at Bennett County before June 2012. Dep. Ex. 11; JT 58:21-23.

In 2012, Joyce expressed concern about the *Pet Visitation Policy* because it would be an inconvenience for her to have to go home to take care of her pets as she lived 22 miles away. Dep. Ex. 31; *see also* AT 21:15-18 (discussing the inability to get home to take the animals out). Joyce expressed dissatisfaction with the policy to her supervisor, Dillon. Dep. Ex. 16. Dillon explained to Joyce that per state regulations, her dogs could not be running unrestrained around Bennett County. *Id.* Dillon's notes reflect,

> I tell [Joyce] she has beautiful dogs and they are more than welcome, just schedule it . . . [Joyce] becomes more upset stating numerous reasons why this does not work for her, **from financial to family**. She wants the dogs in the office. I explain again that this is not our home. She states she can put the supplies out in the hall on the floor while the dogs are here!

*Id.* (emphasis added). Joyce's dislike for Ethel started once Ethel implemented the *Pet Visitation Policy*. Dep. Ex. 31. In 2012, Joyce did not say anything about any of her dogs being service animals. *Id.* In fact, it was not until 2014 that Joyce claimed her dog Cheikah was her "service animal." Ex. 105, pgs. 1, 18; Dep. Ex. 14.

In November of 2012, Joyce was suspended, in part, after yelling at the Director of Nursing regarding the care a patient was receiving in the Emergency Room. *See* Dep. Ex. 18, 44. Joyce said to Dillon, "Well [the DON] doesn't know her f__'n job she won't even pay attention to an EMTALA violation. All I was doing was bringing that to her attention." Dep. Ex. 18. Dillon instructed Joyce, "It was the manner that you did that in. You need to take a step back and listen to how you talk to people." Dillon continued, "[Joyce] became more angry and was yelling at me. *Id.* Finally, Dillon told Joyce she was suspended for the rest of the afternoon and the following day.

*Id.* Joyce responded, "You can just take have this f___'n job. I don't care anymore . . ." and stormed out of the office. *Id.*

Just before this incident, Joyce lost her step-father and uncle, and her grandfather suffered a stroke. JT 152:10-19. Joyce described that she was in mourning over the recent loss of her family members. *Id.* On November 29, 2012, Joyce attempted suicide. JT 154:11-14. Joyce was transported to Rapid City Regional Hospital ("RCRH"). Dep. Ex. 19. Her medical records detail her frustration about voicing her concerns to the DON about the patient and that she was suspended. *Id.* There is no mention of dogs or Ethel. *Id.* Despite that, during her deposition, Joyce testified that she took the pills because of Ethel and because she needed her dog at work. JT 156:12-17; JT 154:15-25; JT 155. Her medical records from RCRH provide, "rule out posttraumatic stress disorder." Dep. Ex. 19. Again, on December 2, 2012, Joyce's medical records provide, "rule out posttraumatic stress disorder." Dep. Ex. 20.

After returning to work, Ethel and Dillon met with Joyce to follow-up on her suspension and ensure that Joyce was ready and able to return to work after her attempted suicide. Dep. Ex. 23. Ethel instructed Joyce that if she was having a bad day, to let Dillon know so Joyce could go home. *Id.* Joyce had no write-ups or unusual outbursts for the remainder of 2012, or in 2013, despite not having her dogs at work with her. JT 186:3-8; JT 185:15-25. In fact, it was not until November of 2014, over two years after the *Pet Visitation Policy* was implemented, that Joyce requested that her dog Cheikah be allowed to come to work with her as her "service dog." Ex. 105, pg. 1, ¶¶3-4. Although Joyce allegedly needed Cheikah as her "service dog",

Joyce never brought Cheikah with her when she would go on ambulance runs, nor did her request for an accommodation include allowing Cheikah to go on the ambulance with her.  AT 43:20-21; AT 47:23-25; AT 48:1-9.  Instead, she wanted Dillon to take care of Cheikah while she was on ambulance runs.  Dep. Ex. 31.

In support of her request, Joyce presented Bennett County with a "US Service Dog" certificate which she purchased online.  Dep. Ex. 14, 15.  The certification did not require the purchaser to establish: any proof of the animal's training, what disability the pet owner had, what the animal was trained to assist the disabled owner with, or *any* other information.  Dep. Ex. 14, 15; JT 103-09.  Indeed, Joyce merely clicked the "Service Dog" package and paid the amount owed to get the "US Service Dog" certificate.  Dep. Ex. 14, 15; JT 103-109.  Joyce believes Cheikah is her "service dog" by virtue of this certificate.  JT 213:1-21.

Joyce indicated that the request to bring Cheikah to work with her was a request for a reasonable accommodation.  *See generally* JT 208:12-19; ET 38:19-22.  In response to the *Reasonable Accommodations* policy, Joyce was asked to have her medical provider fill out the *Medical Inquiry Form in Response to a Reasonable Accommodation* to ascertain what disability she had and what reasonable accommodation was necessary.  Dep. Ex. 24, 26.  Dr. Lyle P. Christopherson, DO (a psychiatrist), completed the form.  *Id.*  He detailed that the nature of Joyce's impairment was "Depression and PTSD" and that Joyce's limitation when the impairment was active was "mood

fluctuations."[6] Dep. Ex. 26. Importantly, however, Dr. Christopherson indicated that Joyce's impairment **did not affect any major life activity**. *Id.* (emphasis added). Dr. Christopherson answered the following questions:

1. What limitation(s) is interfering with job performance or accessing a benefit of employment? **Companion dog**.

2. What job function(s) or benefits of employment is the employee having trouble performing or accessing because of the limitation? **all**

3. How does the employee's limitation(s) interfere with his/her ability to perform the job function(s) or access a benefit of employment? **Marked [increase] in depression when dog was banned.**

Dep. Ex. 26.

Ultimately, the reasonable accommodation committee denied Joyce's request. Dep. Ex. 27. After her request was denied, Joyce's behavior at Bennett County became disruptive and unprofessional. Ex. 105, pg. 2, ¶9. On February 4, 2015, Joyce told Dillon that she wished Ethel would get beaten "so bad she can never do anything to anyone again." Ex. 105, pg. 19, ¶9. Joyce referred to Ethel as a "bitch". *Id.* On February 26, 2015, Joyce barged unannounced into the Board of Directors meeting, demanding that the Board listen to her complaints about the reasonable accommodation committee. Ex. 105, pg. 2, ¶10. Because Joyce was not on the agenda, the Board President politely asked Joyce to follow the appropriate policy and get on the agenda for the next week's Board meeting. Ex. 105, pgs. 7, 24-26, ¶¶5-

---

[6] Nancy Webb, in response to a *Medical Statement of Ability to Work* requested by the SDUID, detailed that Joyce's restrictions/limitations at work were "needs service dog/accommodations." In the comments, Webb wrote, "Service Dog helps calm at times of anxiety." Ex. 107.

6. The Board President instructed her to follow the steps outlined in the grievance procedure. Ex. 105, pg. 2, ¶¶11-12; pg. 7. Joyce stormed out of the room and slammed the door. Ex. 105, pg. 25, ¶7. Joyce was heard yelling down the hallway as she left. *Id.*

On March 2, 2015, Ethel attempted to speak to Joyce about her disrespectful and disruptive attitude and conduct. Ex. 105, pg. 3, ¶14. Joyce refused to listen. *Id.* Instead, Joyce placed her hands over her ears and repetitively said, "No." *Id.* Joyce left the office and went into the hospital breakroom. *Id.* Ethel and Dillon followed Joyce into the breakroom. *Id.* at ¶15. When Joyce refused to talk to Dillon and Ethel, Bennett County terminated her employment. *Id.* at ¶16. Joyce was discharged for multiple instances of work-place misconduct, including slamming doors, ignoring supervisors, using profanity at work, and ignoring company policies. Ex. 105, pg. 3, ¶18; pg. 8; pg. 48, ¶10. After Joyce was terminated, Ethel found, what appeared to be, an appeal from the Committee's decision in her mailbox. Ex. 105, pg. 3, ¶17; Ex. 106, pgs. 3-7.

On March 11, 2015, Joyce filed a Charge of Discrimination with the South Dakota Division of Human Rights ("SDDHR"), alleging that Bennett County discriminated and retaliated against her in violation of the Americans with Disabilities Act of 1972 ("ADA") by terminating her employment after requesting that her dog come to work with her. Ex. 105, pg. 35, ¶1; Ex. 106, pg. 8-9.

On March 12, 2015, Joyce filed a claim for unemployment benefits with the South Dakota Unemployment Insurance Division ("SDUID"). Ex. 105, pg. 48, ¶9. On March 16, 2015, Bennett County opposed Joyce's claim for

unemployment benefits due to her workplace misconduct. *Id.* The SDUID concluded that Joyce was disqualified from receiving unemployment benefits due to her work-connected misconduct. *Id.* at ¶12. Joyce appealed this determination, and, on April 20, 2015, a hearing was held before Administrative Law Judge Shannon George-Larson ("Judge George-Larson"). *Id.* at ¶13. Thereafter, on April 28, 2015, Judge George-Larson entered *Findings of Fact and Conclusions of Law* and an *Order* affirming the decision of the SDUID. Ex. 105, pgs. 12-17. Judge George-Larson concluded that Joyce was disqualified from receiving unemployment insurance benefits because she was discharged for work-connected misconduct. *Id.*

Between April and June of 2015, Ethel received numerous complaints about Alfred's employment performance at Bennett County. *See* Affidavits and accompanying exhibits of Ethel Martin, Lisa Rayhill, Rose Marie Hoiten, and Diane Weber. Ex. 108, pgs. 1-36. Alfred's employment performance issues included: misuse of the ambulance (running personal errands), unavailability when on-call for emergency transportation services, failing to create an on-call schedule as required in his job description, and arguing with a physician's assistant regarding proper care of a mental health patient. *Id.* After multiple attempts to work with Alfred to resolve the issues, it became clear that Alfred had to be terminated. *Id.* at 26-29. Finally, on June 2, 2015, Alfred's employment was terminated for substandard performance, insubordination, not following proper chain of command, overstepping scope of practice, and unauthorized use of ambulance for personal errands. *Id.*

## Procedural Background

On July 31, 2015, the SDDHR issued a *Determination of Probable Cause* on Joyce's first Charge of Discrimination (wherein she alleged that Bennett County discriminated against her in violation of the ADA by terminating her employment after requesting a reasonable accommodation). Ex. 105, pg. 35, ¶1; Ex. 106, pgs. 8-9; Ex. 104.

On July 24, 2015, Joyce filed her second Charge of Discrimination alleging that Bennett County retaliated against her by opposing her application for unemployment benefits in violation of the South Dakota Human Relations Act of 1972. Ex. 106, pgs. 1-2. On the same date, Alfred also filed a Charge of Discrimination, alleging that he was retaliated against by "participating and assisting" Joyce in her efforts to enforce her rights under the Americans with Disabilities Act. Dep. Ex. 65.

On December 1, 2015, the SDDHR issued a *No Probable Cause* determination and dismissed Joyce's second charge. Ex. 105, pgs. 42-46. Joyce requested that the Equal Employment Opportunity Commission conduct a substantial weight review of her claims under federal law. Ex. 106, pg. 10. Joyce then appealed the SDDHR's decision to the Sixth Judicial Circuit. Ex. 105, pg. 49. After reviewing the entirety of the record, reviewing the submissions of both parties, and hearing oral argument, the Honorable Mark Barnett affirmed the SDDHR's decision in its entirety. Ex. 106, pg. 11. Joyce appealed this decision to the South Dakota Supreme Court. *Id.* at 12. The SDSC has not issued a decision as of March 23, 2018.

On December 1, 2015, the SDDHR issued a *No Probable Cause Determination* on Alfred's Charge of Discrimination.  Ex. 108, pgs. 37-40. Alfred appealed that decision to the Sixth Judicial Circuit, who reversed and remanded the decision back to the SDDHR.  Ex. 109.  Again, on January 17, 2017, the SDDHR issued a second *No Probable Cause Determination.*  Ex. 110.  Alfred did not appeal this decision.

On August 26, 2016, Joyce and Alfred filed a lawsuit, alleging that Bennett County discriminated against Joyce in violation of the Americans with Disabilities Act of 1990 ("ADA") by: (1) failing to accommodate her alleged disability, (2) retaliating against her by terminating her employment for seeking a reasonable accommodation, and (3) retaliating against her by opposing her claims for unemployment benefits.  Additionally, Joyce alleges a claim for intentional or reckless infliction of emotional distress.  Alfred alleges that Bennett County: (1) terminated Alfred as further retaliation against Joyce, and (2) terminated him for assisting Joyce in her attempt to enforce her rights under the ADA.  Bennett County filed its *Answer* on September 28, 2016.

## Legal Analysis

## Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The Court views the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences from that evidence in favor of the nonmoving party."

*Gesinger v. Burwell*, 210 F. Supp. 3d 1177, 1188 (D.S.D. 2016) *citing Smith v. URS Corp.*, 803 F.3d 964, 968 (8th Cir. 2015).

## 1. Joyce cannot establish a prima facie case of discrimination under the Americans with Disabilities Act.

The Americans with Disability Act ("ADA") prohibits discrimination against persons with disabilities in three major areas: employment (Title I); public services, programs, and activities (Title II); and public accommodations (Title III). Title I of the ADA makes it unlawful for a private employer to discriminate against any "qualified individual on the basis of disability." 42 U.S.C. § 12112(a).

To establish a claim under Title I of the ADA, a plaintiff must first show: (1) that she is disabled; (2) that she is qualified to perform the essential functions of the job either with or without accommodation; and (3) that she has suffered adverse employment action because of the disability. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948 (8th Cir. 1999). Summary judgment is proper if a plaintiff fails to establish any element of her prima facie case. *Treanor v. MCI Telecomm. Corp.*, 200 F.3d 570, 574 (8th Cir. 2000).

### A. Joyce does not have a disability as defined by the ADA.

To establish a claim under the ADA, Joyce must first establish that she has a disability. The ADA defines disability as "a physical or mental impairment that *substantially limits* one or more *major life activities* of such individual . . ." 42 U.S.C.A. § 12102 (emphasis added). In other words, the employee must prove: (1) the existence of the impairment, and (2) that the impairment *substantially limits* at least one of her major life activities. A

"physical or mental impairment" includes "any mental or psychological disorder . . . emotional or mental illness . . ." 29 C.F.R. § 1630.2(h)(2). "Major life activities" include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, concentrating, thinking, communicating, and working." 29 C.F.R. § 1630.2(i)(i).

Joyce claims she suffers suffer from Post Traumatic Stress Disorder ("PTSD"), which impairment, standing alone, is not necessarily a disability contemplated by the ADA.[7]  Accepting Joyce's claim that she has an impairment, Joyce cannot show that her PTSD substantially limited her in one or more of her major life functions.  Indeed, Joyce's treating physician acknowledged that *none* of her major life activities were affected by her PTSD.  *See* Dep. Ex. 26 ("[W]hat major life activity(s) (includes major bodily functions) is/are affected?"  Dr. Christopherson wrote "**N/A**". )  The only "limitation" resulting from the impairment was "mood fluctuations."  *Id.*

It is not enough that an individual simply allege that they suffer from PTSD to establish the existence of a "disability" as defined under the ADA.[8]

---

[7] Some of Joyce's medical records actually indicate that she does not, in fact, have PTSD.  Dep. Ex. 19 and 20.

[8] There is no allegation in Joyce's *Complaint* which details that Joyce's PTSD substantially limits one or more of her major life activities.  *See* Complaint. Similarly, when asked what employment activities Joyce had difficulty performing, Joyce alleged she had difficulty with "concentration and staying on task."  JT 216:17-218:1.  These assertions do not merit a genuine dispute of fact where Joyce's own physician denied that her impairment interfered with any major life function. *See Alexander v. Tomlinson*, 507 F. Supp. 2d 2, 21 (D.D.C. 2007)(Employee failed to establish prima facie case of disability discrimination where only evidence he produced regarding the extent to which he had been prevented from caring for

*See Lane v. Bell County Bd. of Educ.*, 72 Fed. Appx. 389, 395 (6th Cir. 2003)(unpublished) (teacher failed to show that her PTSD was a "disability" within the meaning of the ADA.); *Evola v. City of Franklin, Tenn.*, 18 F. Supp. 3d 935 (M.D. Tenn. 2014) (discharged police officer failed to demonstrate that she was disabled within the meaning of the ADA absent a showing that her PTSD impaired or limited one or more of her major life activities.); *Sellers v. Deere & Co.*, 23 F. Supp. 3d 968 (N.D. Iowa 2014) (employee was not disabled under the ADA where the Employee's PTSD, depression, and anxiety did not substantially limit any of her major life activities.).

There certainly is no genuine dispute as to whether Joyce is disabled under the ADA where her own physician details that her PTSD does not limit her in any major life activity. Because Joyce cannot make this preliminary showing, all of her claims under the ADA fail and summary judgment is proper. *Treanor v. MCI Telecomm. Corp.*, 200 F.3d 570, 574 (8th Cir. 2000).

## B. Joyce could perform the essential functions of her job without a reasonable accommodation.

Next, Joyce must establish that she was a "qualified individual" as defined under the ADA. A "qualified individual" is:

> [A]n individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or

---

himself was his own declaration which stated he was diagnosed with severe anxiety and major depression that prevented him from eating, sleeping, and concentrating and as result was substantially limited from caring for himself through fourteen or fifteen month period.)

interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C.A. § 12111. The determination of whether an employee is a "qualified individual" involves a two step inquiry. *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003). First, the employee must show that she meets the necessary prerequisites for the job. *Id.* Secondly, the employee must demonstrate that she can perform the essential functions of her job, with or without reasonable accommodation. *Id.* Essential functions[9] of a position are the fundamental duties of the job, but not its marginal functions. *Canny v. Dr. Pepper/Seven–Up Bottling Grp., Inc.*, 439 F.3d 894, 900 (8th Cir.2006).

Joyce has been an employee of Bennett County since 2006. Although she has multiple documented performance issues, Joyce *does* meet the necessary prerequisites to perform her job in Central Supply and as an EMT. Joyce met all the necessary prerequisites to perform her job, and did indeed, perform her job duties and responsibilities from 2012 (when the *Pet Visitation Policy* was implemented) until November 2014 (when she requested that Cheikah come to work with her) even though Cheikah was not with her. Joyce acknowledges the same:

Q: And you worked all during 2013, correct?

---

[9] In determining whether a job function is essential, the following factors should be considered: (i) [t]he employer's judgment as to which functions are essential; (ii) [w]ritten job descriptions prepared before advertising or interviewing applicants for the job; (iii) [t]he amount of time spent on the job performing the function; (iv) [t]he consequences of not requiring the incumbent to perform the function; (v) [t]he terms of a collective bargaining agreement; (vi) [t]he work experience of past incumbents on the job; and/or (vii) [t]he current work experience of incumbents in similar jobs. *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir.2007); 29 C.F.R. § 1630.2(n)(3).

A: Yes.

Q: And you worked all during 2014, correct?

A: Yes.

. . .

Q: During 2013 do you ever recall any kind of major issues or blowups or outbursts or anything like that where you and Ethel had issues or concerns or problems?

A: Not that I recall.

Q: Your employment went pretty good in '13?

A: I guess so.

JT 185:22-25; 186:3-10.

There is no indication that Joyce could not perform the essential functions of her job without Cheikah.  Dep. Ex. 5.  When asked what job duties Joyce could not perform without Cheikah, Joyce indicated that she had difficulty concentrating some days: "I was having trouble just keeping my head on the task at hand", "When I was having a bad day, I could not – it would take me a lot longer to put together a purchase order because I could not keep my mind at task . . ." JT 216:23-24; 217:20-22.  Despite her alleged inability to concentrate, Joyce never received a write-up from her supervisor or Ethel, nor received an evaluation which indicated she was failing to meet expectations.  JT 218:22-219:5.

Because Joyce could perform the essential functions of her job without an accommodation, it was not necessary for Bennett County to provide a reasonable accommodation.  Even if Joyce established that she could not perform the essential functions of her job without an accommodation, Joyce

cannot make a facial showing that the requested reasonable accommodation is possible and that it would allow her to perform the essential functions of her job. *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 846 (8th Cir. 2015).

## C. Joyce was terminated from Bennett County for work-place misconduct.

Finally, Joyce must establish that she has suffered an adverse employment action *because* of her disability. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948 (8th Cir. 1999). Joyce was terminated for multiple instances of work-place misconduct, including slamming doors, ignoring supervisors, using profanity at work, and ignoring company policies. Ex. 105, pg. 48, ¶10; pg. 3, ¶18; pgs. 1-33. Bennett County understands that there may be a genuine dispute between the parties as to the basis of Joyce's termination, so it will not analyze the third element of this claim.

## 2. Bennett County did not fail to accommodate Joyce's requested accommodation in violation of the ADA.

In Count I of her *Complaint*, Joyce alleges that Bennett County failed to accommodate her disability. Complaint, ¶¶110-114. Assuming *arguendo* that Joyce could establish a prima facie case of discrimination *and* that Bennett County *knew* of her disability, Joyce's proposed accommodation was not reasonable on its face. Therefore, Bennett County is entitled to summary judgment on Joyce's failure to accommodate claim.

Under the ADA, "discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Scruggs v. Pulaski County, Ark.*, 817 F.3d 1087, 1094 (8th Cir. 2016) (quotations omitted). Unlike other claims for

discrimination, a claim for failure to accommodate is not analyzed under the *McDonnell-Douglas* burden-shifting framework because an employer's failure to accommodate a disabled employee does not turn on the employer's intent or actual motive. *See Gesinger v. Burwell*, 210 F. Supp. 3d 1177, 1193 (D.S.D. 2016). Instead, a failure to accommodate claim is framed in terms of whether or not the employer fulfilled its affirmative duty. *Id.* "The Act compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts." *Id.* quoting *Kiel v. Select Artificials*, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). Discrimination occurs when the employer fails to abide by that legally imposed duty. *Id.* It is the known disability which triggers the duty to accommodate. *Id.*

In order to survive summary judgment, however, the plaintiff must show that the requested accommodation is "**reasonable on its face**, *i.e.,* ordinarily or in the run of cases." *Peebles v. Potter*, 354 F.3d 761, 768 (8th Cir. 2004) *citing U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002) (emphasis added). A reasonable accommodation is one that is feasible or plausible. *Barnett*, 535 U.S. at 402. "If the plaintiff can make such a showing, the employer must show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstance." *Gesinger v. Burwell*, 210 F. Supp. 3d 1177, 1193 (D.S.D. 2016) (internal quotations omitted).

Allowing a dog to be present at work is not specifically contemplated as a reasonable accommodation under Title I of the ADA. 42 U.S.C.A. § 12111(9). Ordinarily, a reasonable accommodation may include: making facilities accessible, modifying work schedules, job restructuring, and making

adjustments or modifications of materials and policies. *Id.* Although there is no precise test for what constitutes a reasonable accommodation, an accommodation is unreasonable if "it requires the employer to eliminate an essential function of the job." *EEOC v. Convergys Customer Mgmt. Group, Inc.*, 491 F.3d 790, 796 (8th Cir.2007) (citations omitted); *Mason v. Avaya Commun., Inc.*, 357 F.3d 1114, 1124 (10th Cir. 2004) (An employee's request to work at home was unreasonable on its face because it would eliminate an essential function of the employee's position.); *Grillasca-Pietri v. Portorican American Broadcasting Co., Inc.*, 233 F. Supp. 2d 258 (D. Puerto Rico 2002). (Preventing stress-producing situations at work is an unreasonable accommodation.); *Wheeler v. Jackson National Life Insurance Co.*, 159 F. Supp. 3d 828, 2016 A.D. Cas. (BNA) 31828 (M.D. Tenn. 2016) (Requested accommodation of ongoing, intermittent leave at the employee's discretion was unreasonable.); *Scruggs v. Pulaski County, Ark.*, 817 F.3d 1087, 1094 (8th Cir. 2016) (Request for additional time to obtain a new FMLA certification was not a reasonable accommodation.).

Allowing an employee's non-housebroken, unrestrained dog in a hospital and nursing home does not pass the "reasonable on its face" test. Most unreasonable about the request is that Joyce worked in the *sterile* Central Supply Office at a hospital and nursing home, and works as an EMT on the ambulance crew. There are most certainly infection control and safety issues implicated by having an untrained dog at Bennett County. Joyce's demand to allow her "service animal accompany her at work" was not plausible or feasible for a variety of reasons, including: Cheikah's demonstrated lack of training (urinating throughout Bennett County), Joyce's failure to restrain

Cheikah (and the safety hazard this could cause for nursing home and hospital patients), and Cheikah's presence in a sterile room.

Certainly, Joyce could not have performed the essential functions of her job with Cheikah. The primary purpose of Joyce's job in Central Supply was "sterilizing all sterile supplies and medical waste . . .". Dep. Ex. 5. The Central Supply room is where all sterile patient supplies are maintained. Dep. Ex. 31. Cheikah's presence in Central Supply would have compromised the sterile environment. Therefore, Joyce could not perform her job in Central Supply. Joyce's request was unreasonable because it would have eliminated the essential functions of her job.

### A. Joyce's request to bring her "service animal" to work was not "reasonable on its face" when analyzed under the regulations of Title III.

Unlike Title III of the ADA, which requires service animals to be allowed in all areas of public access, Title I only requires employers to make "reasonable accommodations" for employees with disabilities. Therefore, an employee with a disability does not have an *automatic* right to have his or her service animal in the workplace. While the definition of "service animal" as provided in Title III does not automatically apply to Title I, the applicable regulations can be a guide to establish whether the request for the presence of a "service animal" at work is reasonable "on its face."

### 1) Cheikah does not qualify as a "service dog" under Title III.

Generally, a public accommodation shall modify policies, practices, or procedures to permit the use of a "service animal" by an individual with a disability. 28 CFR § 36.302(c)(1). A "service animal" is:

> [A]ny dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability. Other species of animals, whether wild or domestic, trained or untrained, are not service animals for the purposes of this definition. **The work or tasks performed by a service animal must be directly related to the individual's disability.** Examples of work or tasks include, but are not limited to, assisting individuals who are blind or have low vision with navigation and other tasks, alerting individuals who are deaf or hard of hearing to the presence of people or sounds, providing non-violent protection or rescue work, pulling a wheelchair, assisting an individual during a seizure, alerting individuals to the presence of allergens, retrieving items such as medicine or the telephone, providing physical support and assistance with balance and stability to individuals with mobility disabilities, **and helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors.** The crime deterrent effects of an animal's presence and **the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition**.

28 C.F.R. § 36.104 (emphasis added). In other words, a "service animal" is: (1) a dog which is specifically trained to do work or perform a task for the benefit of an individual with a disability, and (2) the work or tasks performed by the dog are directly related to the individual's disability. *Id*. Animals that merely provide emotional support, well-being, comfort or companionship *do not equate* to "work or tasks" related to the individual's disability. *Id*.

The basis upon which Joyce believes Cheikah is a "service dog" is by virtue of purchasing a "US Service Dog" certificate from the internet, which required absolutely no showing that the dog was trained to do anything.[10] Clearly, Cheikah does not qualify as a "service dog" as defined in Title III. Nancy Webb, CNP, merely indicated that Joyce "needs service dog/accommodations" because the "service dog helps calm at times of anxiety." Ex. 107. Dr. Christopherson indicated that Joyce's "companion dog" interfered with Joyce's job performance and Joyce experienced "Marked [increase] depression when dog was banned." Dep. Ex. 26.

Cheikah may provide Joyce with emotional support, well-being, comfort, or companionship, but there is no evidence to support that Cheikah has been "individually trained to do work or perform tasks for the benefit" of Joyce's alleged disability. When analyzed in the Title III context, Cheikah would not be considered a "service dog" or allowed in areas of public accommodations. An employer, then, should certainly be able to deny a request to bring a dog to work when there is no showing that the dog was individually trained to assist the employee with her disability.

### 2) A public accommodation could ask Cheikah to be removed because she was not housebroken and was regularly left unrestrained.

Under the ADA, public accommodations must generally allow service dogs. However, these pubic accommodations may ask that a service dog be removed if:

---

[10] In Joyce's words, the only thing stopping any person from buying a certificate for their pet to be converted into a "service animal" was one's "conscience." JT 108:13-18.

1. The animal is out of control and the animal's handler does not take effective action to control it; or

2. The animal is not housebroken.

28 CFR § 36.302(c)(2). Service animals must be under the control of its handler. 28 C.F.R. § 36.302(c)(4).

> A service animal shall have a harness, leash, or other tether, unless either the handler is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which case the service animal must be otherwise under the handler's control (e.g., voice control, signals, or other effective means).

*Id.* A public accommodation is not responsible for the care or supervision of a service animal. 28 C.F.R. § 36.302(c)(5). "A service animal can be excluded from a facility if its presence interferes with legitimate safety requirements of the facility (e.g., from a surgery or burn unit in a hospital in which a sterile field is required)." https://adata.org/factsheet/service-animals.

Although Joyce requested that Cheikah be allowed to come to work with her as her "service dog", Joyce has a long history of allowing all of her pets to run around Bennett County unrestrained and let them urinate throughout the premises. Dep. Ex. 61. When Ethel asked Joyce about what she would do with Cheikah when she had to go on ambulance runs, Joyce indicated that Dillon, her supervisor, could take care of Cheikah. Ambulance runs to and from Rapid City can last anywhere between 5 to 8 hours. When Ethel questioned "boy, that's a long time for [Dillon] to watch the dog . . . and the dog really shouldn't become the responsibility of other staff," Joyce replied, "well then I can pull my car in the Maintenance Garage when the ambulance comes out and lock her in the car." Dep. Ex. 31.

Like a public accommodation, an employer should have the ability to remove an animal which is not housebroken and left unrestrained. This is especially important when the employer is a hospital and nursing home. Further, it is not the responsibility of the employer to take care of the "service animal" for hours at a time.[11]

## A.    Undue Hardship

If this Court finds that Joyce's request to bring Cheikah to work with her was "reasonable on its face," then Bennett County must "show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstance." *Gesinger*, 210 F. Supp. 3d at 1193. The ADA prohibits an employer from "not making a reasonable accommodations . . . unless [the employer] can demonstrate that the accommodation would impose **an undue hardship** on the operation of the business. . . ." 42 U.S.C.A. § 12112(b)(5)(A) (emphasis added). Undue hardship means an action requiring significant difficulty or expense, when considered in light of the factors set forth below:

    (i)   the nature and cost of the accommodation needed under this chapter;

    (ii)  the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

    (iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to

---

[11] This also begs the question, why doesn't Joyce require her "service dog" to be present with her on the ambulance? Certainly, the ambulance is a more stressful environment than stocking or sterilizing supplies in the Central Supply office.

the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.

42 U.S.C.A. § 12111(10).

"Undue hardship refers not only to financial difficulty, but to reasonable accommodations that are unduly extensive, substantial, or disruptive, or those that would fundamentally alter the nature or operation of the business." ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT, 1999 WL 33305876, at *3.

Subsection (ii) and (iv) specifically contemplate the impact that accommodation would have on the operation of the facility. 42 U.S.C.A. § 12111(10). Allowing an untrained, unrestrained dog to run around a hospital and nursing home would be substantially disruptive to the operations of Bennett County. The health and safety concerns are self-evident. There are certainly issues of cleanliness and sanitation where the dog urinates throughout the hospital. Patients and residents may slip or fall over the dog, or slip on the dog's urine. Cheikah's presence in the Central Supply office, where supplies are cleaned and sterile supplies are stored, would substantially interfere with the operations of the Central Supply office. Further, when Joyce was out on ambulance runs, she wanted Dillon to watch Cheikah. It was not Dillon's primary job responsibility to care for a dog for five to seven hours at a time. Bennett County would have to hire another

employee to care for Joyce's dog while she was out on ambulance runs. Certainly, allowing an untrained, unrestrained dog at Bennett County would pose an undue hardship.

### 3. Bennett County is entitled to summary judgment on Joyce's retaliation claim.

In Count III of Joyce's *Complaint*, she alleges that Bennett County retaliated against her in violation of the ADA when it opposed her claim for unemployment benefits. *Complaint*, ¶119-122. In other words, Joyce claims she engaged in protected activity by seeking unemployment benefits, and Bennett County took an adverse employment action against her by opposing her claim for unemployment benefits.

### A. Joyce cannot establish a prima facie case of retaliation under the ADA.

To establish a prima facie case of retaliation, the employee must demonstrate that "1) [she] engaged in statutorily protected activity; 2) the employer took an adverse personnel action; and 3) there was a causal connection between the adverse action and the protected activity." *Hill v. Walker,* 737 F.3d 1209, 1218 (8th Cir. 2013); *Green v. Franklin Nat'l Bank of Minneapolis,* 459 F.3d 903, 914 (8th Cir. 2006). Summary judgment is appropriate if a plaintiff fails to establish any element of a prima facie case. *Kellogg v. Union P. R. Co.*, 233 F.3d 1083, 1086 (8th Cir. 2000).

### B. Joyce did not engage in protected activity by filing for unemployment benefits.

The first-prong of a prima facie case of retaliation requires Joyce to show that she engaged in a statutorily protected activity. *E.E.O.C. v. Product*

*Fabricators, Inc.,* 763 F.3d 963, 972 (8th Cir. 2014); *Hill v. Walker,* 737 F.3d 1209, 1218 (8th Cir. 2013). The ADA defines protected activity in its "retaliation clause." 42 U.S.C. § 12203(a). The "retaliation clause" makes it "unlawful . . . for an employer to discriminate against any individual employee because" the individual either: (1) opposed any act or practice made unlawful under the ADA, or (2) made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this chapter." *Id.* The retaliation clause only prohibits retaliation for engaging in, or aiding another who engages in, activity covered by the ADA. 42 U.S.C. § 12203(a).

Joyce asserts that she "engaged in a protected activity when she sought unemployment insurance benefits." *Complaint,* ¶119. Seeking unemployment benefits is not protected activity under the retaliation clause. 42 U.S.C. § 12203(a). Indeed, to engage in protected activity, the individual must be asserting some right under the ADA. For example, protected activity includes: requesting an accommodation, filing a complaint with the EEOC or the SDDHR, filing a lawsuit or helping someone else pursue a claim of discrimination. ¶240 RETALIATION, 2008 WL 4817023. Conversely, where employees engage in conduct which is not protected under the ADA, the individual cannot establish that he/she engaged in protected activity. *See Reynolds v. American National Red Cross*, 701 F.3d 143 (4th Cir.2012) (Court held that the plaintiff's claim that his employer retaliated against him for filing a worker's compensation claim failed because such a claim is not covered by the ADA.); *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014) (Court concluded that the ADA does not protect an employee who participates in arbitration proceedings contesting employment decisions that

do not involve any claims of discrimination.); *Skinner v. City of Amsterdam*, 824 F. Supp. 2d 317, 332 (N.D.N.Y. 2010) (Filing complaint with Department of Transportation is not protected activity under the ADA.).

On March 12, 2015, Joyce filed a claim for unemployment benefits with the SDUID. Ex. 105, pg. 48, ¶9. That claim had nothing to do with asserting rights protected under the ADA. Indeed, the purpose of filing for unemployment benefits is to relieve economic insecurity resulting from the loss of one's job. *See Abild v. Gateway 2000, Inc.*, 547 N.W.2d 556, 559-60 (S.D. 1996). Four days later, Bennett County opposed Joyce's claim for unemployment benefits because Joyce was terminated for "misconduct" as defined by South Dakota law.[12] Ex. 105, pg. 48, ¶9. As a matter of law, this Court must find that Joyce did not engage in "protected activity" by filing for unemployment benefits.

---

[12] Employees who are discharged for work-connected misconduct "shall be denied benefits." SDCL § 61-6-14. "Misconduct" includes:

    (1) Failure to obey orders, rules, or instructions, or failure to discharge the duties for which an individual was employed; or

    (2) Substantial disregard of the employer's interests or of the employee's duties and obligations to the employer; or

    (3) Conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of an employee; or

    (4) Carelessness or negligence of such degree or recurrence as to manifest equal culpability or wrongful intent.

SDCL § 61-6-14.1.

### C. Bennett County did not take an adverse action against Joyce by opposing her claim for unemployment benefits.

Joyce alleges that she "suffered an adverse employment action when [Bennett County] opposed her claim for unemployment insurance benefits in bad faith by reciting pretextual bases for her dismissal to the South Dakota Department of Labor." *Complaint*, ¶120. Most importantly, Joyce cannot establish a prima facie case of retaliation because Bennett County did not take any adverse employment action against her *as a result* of her applying for unemployment benefits.

The applicable test for an adverse employment action within the context of the ADA is that an employee must show that a reasonable employee would have found the challenged action materially adverse, which means a reasonable employee might have been dissuaded from making or supporting a charge of discrimination. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006). "[C]ourts must examine each case to determine whether the challenged employment action reaches the level of 'adverse.'" *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir. 1997).

Courts have consistently found that an employer's objection to an application for unemployment benefits is not an adverse employment action. *See Roman v. Cornell U.,* 53 F. Supp. 2d 223, 245 (N.D.N.Y. 1999) ("Cornell's opposition to plaintiff's application for unemployment benefits, however, is not an adverse employment action. This was a permissible, non-discriminatory legal position taken by Cornell in opposition to plaintiff's application for such benefits. Employers frequently challenge a former employee's application for unemployment insurance benefits when the

employer has terminated the employee for cause."); *Jenkins v. St. Luke's–Roosevelt Hosp. Ctr.,* No. 09–CV–12, 2009 WL 3682458, at *9 (S.D.N.Y. Oct. 29, 2009) (granting motion to dismiss retaliation claim regarding employer's cessation of unemployment benefits); *Barriera v. Bankers Trust,* No. 98–CV–3641, 2003 WL 22387099, at *7 (S.D.N.Y. Oct. 20, 2003) (finding no adverse employment action where employer opposed plaintiff's unemployment benefits claim); *Roman v. Cornell Univ.,* 53 F.Supp.2d 223, 245 (N.D.N.Y.1999) (holding that employer's opposition to plaintiff's unemployment benefits application does not constitute an adverse employment action); *Wright v. City of Syracuse*, 5:10-CV-0661 GTS/TWD, 2014 WL 1293527, at *20 (N.D.N.Y. Mar. 31, 2014), *aff'd*, 611 Fed. Appx. 8 (2d Cir. 2015) (unpublished) (granting summary judgment in favor of defendant on retaliation claim based on employer contesting unemployment benefits); *Hatton v. United Parcel Serv.*, CIV.A. 05-97-JBC, 2006 WL 1895724, at *3 (E.D. Ky. July 7, 2006) ("An employer may challenge a former employee's application for unemployment benefits without running afoul of anti-retaliation laws. Reasonable legal positions, without more, do not constitute retaliation."); *Baker v. Summit Unlimited, Inc.*, 855 F. Supp. 375, 376 (N.D. Ga. 1994) (employer's opposition to plaintiff's claim for unemployment benefits was not retaliatory in nature and therefore not a basis for a claim under Title VII). Instead, it is an employer's right and duty to respond to a request for unemployment benefits. *Id.* at 376 ("Such opposition was clearly the employer's right and duty and not retaliatory in nature, since [p]laintiff initiated the unemployment process and the employer participated as required.").

After being terminated from Bennett County, Joyce filed for unemployment benefits with the SDUID. Accordingly, Bennett County responded to the SDUID regarding her request. Under Joyce's theory, no employer could contest unemployment benefits if the employee alleged a claim of discrimination without being further accused of retaliating against the employee. That cannot be the standard. Under South Dakota law, employees terminated for misconduct are not entitled to unemployment benefits. SDCL § 61-6-14. An employer must have the ability and legal right to have a determination made by the SDUID.

Bennett County's opposition to her unemployment benefits was not frivolous or illegitimate, nor was it done in bad faith or intended to dissuade Joyce from making or supporting a charge of discrimination.[13] Ex. 105, pgs. 1-33. A reasonable employee who files for unemployment benefits would not find that the employer's opposition to unemployment benefits would dissuade the employee from making or supporting a charge of discrimination. Because Joyce failed to establish that Bennett County took any adverse employment action against her, her claim fails.[14]

_____

[13] Indeed, by this time, Joyce had already filed her first Charge of Discrimination, and then filed her second Charge of Discrimination after Bennett County opposed her unemployment benefits. At least in Joyce's case, Bennett County's opposition to her unemployment benefits did not dissuade her from filing a charge of discrimination.

[14] The final element of Joyce's prima facie case requires that she establish that her protected activity was a but-for cause of the alleged adverse action. *University of Texas Southwestern Medical Center v. Nassar,* __ U.S.__, *133 S.Ct. 2517, 186 L.Ed.2d 503 (2013); Brooks v. Capistrano Unified Sch. Dist.,* 1 F. Supp. 3d 1029, 1037 (C.D. Cal. 2014) ("ADA retaliation claims are also subject to a but-for causation standard."). In other words, Joyce had the burden to establish that Bennett County opposed her unemployment benefits *because* she filed for

## D. Bennett County opposed Joyce's application for unemployment benefits for a legitimate, non-discriminatory reason.

If the plaintiff can establish a prima facie case of retaliation, a presumption of unlawful discrimination by the employer is created and the burden then shifts to the employer to rebut the presumption. *Coleman-Santucci v. Sec'y U.S. Dep't of Health & Human Servs.*, 754 F. Supp. 209, 216 (D.D.C. 1991). "The employer must present evidence that the adverse action against the [charging party] was motivated by legitimate, nondiscriminatory reasons." *Id.* If the employer carries its burden, the burden shifts back to the employee to establish "that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

Bennett County opposed Joyce's unemployment benefits because she was terminated for work-connected misconduct. SDCL § 61-6-14. After Joyce's request to bring Cheikah to work with her was denied, her behavior at Bennett County became disruptive and unprofessional. Joyce was discharged for multiple instances of work-place misconduct, including slamming doors, ignoring supervisors, using profanity at work, and ignoring company policies. Ex. 105, pg. 3, ¶18; pg. 8; pg. 48, ¶10. When Bennett County was contacted by the SDUID, it simply detailed the reasons why Joyce was terminated.

---

unemployment benefits. Bennett County does not dispute that it opposed her claim for unemployment benefits *because* she filed for unemployment benefits. This element clearly shows the error in Joyce's allegation that filing for unemployment benefits is protected activity.

### 4. Bennett County did not engage in extreme or outrageous conduct to support Joyce's claim for intentional or reckless infliction of emotional distress.

In Count IV, Joyce alleges that Bennett County engaged in "extreme and outrageous conduct" by repeatedly rejecting Joyce's request for an accommodation, delaying Bennett County's response to her request, insulting and demeaning Joyce, rejecting Joyce's request, retaliating against Joyce by opposing unemployment benefits, and terminating Alfred. Complaint, ¶123.

The elements for intentional infliction of emotional distress include: (1) extreme and outrageous conduct by the defendant; (2) that the defendant intended to cause severe emotional distress; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress must result. *Christians v. Christians*, 637 N.W.2d 377, 382 (S.D. 2001). "[T]he conduct necessary to form intentional infliction of emotional distress must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." *Reynolds v. Ethicon Endo-Surgery, Inc.*, 454 F.3d 868, 874 (8th Cir. 2006) (internal quotations omitted). Whether conduct is extreme enough to permit recovery on a theory of intentional infliction of emotional distress is a question of law. *Christensen v. Quinn*, 45 F.Supp.3d 1043, 1091 (D.S.D. 2014). Viewing all the facts in the light most favorable to Joyce and Alfred, there is no conceivable way the complained of conduct amounted to conduct which is so "atrocious, and utterly intolerable in a civilized community." As a matter of law, Bennett County did not engage in extreme or outrageous conduct to warrant an action for intentional infliction of emotional distress.

*Joyce & Alfred Riggs v. Bennett Co. Hosp. & Nursing Home*  *Brief in Spt of MSJ*
Civ. 16-5077-JLV

**5.** **Alfred's claims of retaliation fail because he cannot establish that he engaged in statutorily protected activity and Bennett County had a legitimate, nondiscriminatory reason to terminate his employment.**

In Count V of Alfred's *Complaint*, he alleges that he was terminated in further retaliation against Joyce when he "aided and encouraged [Joyce] in her efforts to exercise her rights to have accommodation for her disability." *Complaint*, ¶125-128. Similarly, in Count VI, Alfred alleges that he was unlawfully retaliated against because he "assisted and encouraged [Joyce] in her efforts to enforce her rights." *Id.* at ¶129-132.

Like Joyce, Alfred must first show that he engaged in statutorily protected activity to establish a claim for retaliation. *Product Fabricators, Inc.,* 763 F.3d at 972: *Hill v. Walker,* 773 F.3d 1209, 1218 (8th Cir. 2013). The participation clause of the ADA prohibits an employer from discriminating against an individual who has "made a charge, testified, *assisted*, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C.A. § 12203(a) (emphasis added). The participation clause requires, *at a minimum*, that an employee "file a charge with the EEOC or otherwise instigate proceedings under the statute for the conduct to fall within the purview of the participation clause." *Parker v. Econ. Opportunity for Savannah-Chatham County Area, Inc.,* 587 Fed. Appx. 631, 634 (11th Cir. 2014)(unpublished); *Williams v. Phillips 66 Company,* 72 F. Supp. 3d 938, 125 Fair Empl. Prac. Cas. (BNA) 215 (S.D. Ill. 2014) (In order to invoke the participation clause, the employee must participate in an "investigation, proceeding, or hearing conducted by an official body *authorized to enforce the [ADA]…*"). The participation clause exists to "protect proceedings and activities which occur in conjunction with or after

the filing of a formal charge" of discrimination. *Id.* There can be no claim for retaliation under the participation clause until there has been "factual allegations of discrimination against a member of a protected group *and the beginning of a proceeding or investigation under [the ADA]*." *Brower v. Runyon*, 178 F.3d 1002, 1006 (8th Cir. 1999) (emphasis added).

**A.     Alfred did not engage in statutorily protected activity under the participation clause.**

Joyce did not file her first Charge of Discrimination until March 11, 2015. Ex. 106, pgs. 8-9. Any conduct which occurred before that date would not be considered conduct protected under the participation clause because there was no "proceeding or investigation" initiated by Alfred or Joyce. Although Alfred alleges that he "aided and encouraged [Joyce] in her efforts" to bring Cheikah to work with her, that request was made in November 2014, months before Joyce filed her Charge of Discrimination.

The *only* allegation made in the *Complaint* relating to Alfred's actions between March 11, 2015 (Joyce's filing of her first charge) and June 2, 2015 (Alfred's termination) include Alfred asking Ethel to allow Joyce to continue working on the ambulance on March 19, 2015. Complaint, ¶84. During his deposition, Alfred described specifically what conduct he engaged in to "assist" Joyce:

> Q: And to be clear, your assisting your wife after she was terminated [included] supporting her in her Charge of Discrimination?

A: Yes.[15]

Q: Taking pictures at Bennett County of the door?

A: Yes.

Q: And attending the unemployment benefits hearing?

A: Yes.

Q: Is there anything else you can think of?

A: Not right off the top of my head. I would have to set down and talk with Joyce and see if she remembered anything that she had me do.

Q: Okay. Well, now is the time for you to tell me if there's anything else –

A: Well, I mean, I – it doesn't come to mind right now.[16]

---

[15] Q: So we briefly mentioned that Joyce filed her Charge of Discrimination sometime in March. Did you assist her in that process at all?

A: I'm sure I did. I couldn't tell you what all I did for her or with her but –

Q: Do you remember how she went about that?

A: Not in specifics.

Q: Okay. Did you review her Charge of Discrimination?

A: I believe I read it. I'm not – I can't tell you what it said right now, but I'll have to look at it again . . .

AT 54:20-55:5.

[16] Alfred also testified that he assisted Joyce with her request for a reasonable accommodation by delivering a letter to the Board members of Bennett County on March 2, 2015, after the reasonable accommodation committee denied Joyce's request. AT 50:4-10. Again, Joyce had not yet filed her Charge of Discrimination at that date.

AT 104:12-105:1. Merely "supporting" Joyce with filing a charge of discrimination cannot be statutorily protected activity. Indeed, Alfred merely described himself as supportive husband. AT 38:14-21. Under this standard, any spouse of an individual who filed a charge of discrimination would be considered to have engaged in statutorily protected activity.

The only "assisting" claims Alfred alleged happened after Joyce filed her Charge of Discrimination was Alfred taking pictures of a door and *attending* an unemployment appeal hearing. In response to allegations that Joyce slammed doors at various times[17], Alfred went to take pictures of the doors to establish "anybody walking in could have done the same thing without knowing about it because the doors swing pretty easily." See AT 62:17-63:7. Alfred received permission from Dillon to take those pictures. *Id*. The photographs do not establish anything about the conduct of Joyce. The action of taking some photos of a door is *de minimis*, at best. Similarly, merely *attending* an unemployment appeal hearing cannot be conduct contemplated by the participation clause.

## B. Alfred was terminated for a legitimate, non-discriminatory reason.

Finally, Alfred cannot establish that he was terminated *because* he "encouraged," "assisted," or "aided" Joyce in her "efforts to enforce her rights guaranteed under the ADA." Complaint, ¶129. *University of Texas Southwestern Medical Center v. Nassar,* 570 U.S.338, 133 S.Ct. 2517, 186

---

[17] It is unknown whether Alfred took pictures in response to Bennett County's claim in Joyce's first or second Charge of Discrimination. *See* eg. Ex. 105, pg. 20, ¶12; pg. 29, ¶6; Dep. Ex. 31. If the pictures were taken in response to the Joyce's second Charge of Discrimination, his adverse action preceded his alleged protected activity.

L.Ed.2d 503 (2013); *Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1037 (C.D. Cal. 2014) ("ADA retaliation claims are also subject to a but-for causation standard.").

As an hourly employee, Alfred was an employee at will under South Dakota law and no reason need be given. SDCL § 60-4-4. Notwithstanding that law, the evidence establishes that Alfred's employment was terminated for substandard performance, insubordination, not following proper chain of command, overstepping scope of practice, and unauthorized use of ambulance for personal errands. Dep. Ex. 64.

The purpose of Alfred's role as Ambulance Director was to "be the leader of an organized, efficient ambulance service, to supervise the Emergency Medical Staff on the ambulance service and maintain an on call EMT schedule in accordance with current federal, state and local standards . . ." Dep. Ex. 63. Alfred was required to maintain an on-call schedule and provide a copy of the schedule to the administrator. *Id.* Importantly, Alfred was responsible for maintaining a "24-hour on-call, call back. The ambulance director *must let the facility know where he/she can be reached at all times*. Or if the ambulance director will be unavailable, who the contact person is and where that individual can be reached. This position requires a telephone." *Id.* (emphasis added).

In the months leading up to Alfred's termination, Ethel received numerous complaints about Alfred's work performance. Ex. 108, pgs. 1-21; pg. 27, ¶6. Ethel met with Alfred and Melanie Peil (human resources) to discuss his substandard work performance on April 7, 2015. *Id.* at ¶7. During that meeting, Ethel instructed Alfred not to use the Bennett County ambulance to

run personal errands. *Id.* at ¶8. A normal transport to Rapid City would take 5.5 hours, but Alfred was taking anywhere between 6 to 11 hours. *Id.* Alfred was displeased with this direction, and questioned why there wasn't a policy which specifically prohibited Bennett County employees from using the ambulance for personal errands. Ethel also instructed Alfred to make sure he adhered to the time card policy and ensure that he was being productive while he was working at Bennett County. *Id.* at ¶¶9, 10. Ethel sent a follow-up email detailing the issues that were discussed in the meeting with Alfred. *Id.* at ¶11; pg. 13. Ethel requested, as detailed in Alfred's job description, that he provide an on-call schedule to ensure that Bennett County knew who to call when it needed ground transportation. *Id.* at 28, ¶13.

Lisa Rayhill, RN/DON, approached Ethel after she received multiple complaints from employees at Bennett County about Alfred's lack of availability and responsiveness to ambulance calls. *Id.* at ¶15; pgs. 23, 30-31. Rose Marie Hoiten, CNP, detailed that she had issues getting ahold of Alfred to arrange ground transport. *Id.* at 24, 32-33. "Due to Alfred's lack of availability, many patients have been forced to be transported by flight instead of ground transportation simply because Alfred Riggs was not answering his calls and/or was not arranging EMTs and EVOC drivers to be staffed for transportation." *Id.* at 33, ¶9. Diane Weber, PA, also had issues getting ahold of Alfred. *Id.* at 25, 34-36. During one encounter, Alfred made a scene in front of a patient, and argued with the recommended care of a Diane Weber, despite his opinion being outside of his scope of responsibility. *Id.*

Alfred did not deny that he knew people were complaining about his unavailability. AT 87:8-88:7. His excuses for being unavailable included being out of cell service, and that when he was hired there was an understanding that he would not always be available, in spite of the plain language in his job description. *Id.*; Dep. Ex. 63. AT 91:1-5; 91:8-92:17. Alfred agreed that it was a problem for the hospital not to be able to reach the ambulance director when ground transportation was needed. AT 95:24-96:5.

Additionally, Alfred did not deny that he would use Bennett County's ambulances to run personal errands. AT 73:25-74:5. Alfred agreed that ambulance transports to and from Rapid City would take approximately five hours. AT 76:24-77:6. However, transports were taking Alfred up to eleven hours. AT 77:11-78:24. However, Alfred did not believe that could be problematic for Bennett County. AT 74:23-75:11.

Due to the issues Bennett County was having with Alfred, it terminated Alfred's employment on June 2, 2015, for substandard performance, insubordination, not following proper chain of command, overstepping scope of practice, and unauthorized use of ambulance for personal errands. *Id.* at 29, ¶16; Dep. Ex. 64. As detailed above, Bennett County terminated Alfred's employment for a legitimate, nondiscriminatory reason.

## Conclusion

For the reasons provided above, Bennett County respectfully requests that this Court **GRANT** its Motion for Summary Judgment in its entirety.

Dated this 23rd day of March, 2018.

BANGS, MCCULLEN, BUTLER,
FOYE & SIMMONS, L.L.P.

BY: */s/ Michael M. Hickey*
      MICHAEL M. HICKEY
      SARAH BARON HOUY
      KELSEY B. PARKER
      333 West Boulevard, Suite 400
      P.O. Box 2670
      Rapid City, SD 57709-2670
      (605) 343-1040
      mhickey@bangsmccullen.com
      sbaronhouy@bangsmccullen.com
      kparker@bangsmccullen.com
      *ATTORNEYS FOR DEFENDANTS*

## D.S.D. Civ. LR 7.1(B)(1) Certificate

I certify that the brief complies with the type volume limitation of D.S.D. Civ. LR 7.1.B.1. The brief contains 11,643 words. I have relied on the word count of the Word® word-processing system used to prepare the brief.

*/s/ Michael M. Hickey*
Michael M. Hickey

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 23, 2018, he caused true and correct copies of the above to be served upon each of the persons identified below as follows:

[ ]  First Class Mail    [ ]  Overnight Mail

[ ]  Hand Delivery     [ ]  Facsimile

[ ]  Electronic Mail    [X]  ECF System


**Mr. Donald Knudsen**
**GUNDERSON, PALMER,**
**NELSON & ASHMORE, L.L.P.**
**506 Sixth Street; P.O. Box 8045**
**Rapid City, SD 57709-8045**
*ATTORNEYS FOR PLAINTIFFS*


_/s/Michael M. Hickey_
MICHAEL M. HICKEY