UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| JOYCE RIGGS and ALFRED RIGGS,<br><br>                    Plaintiffs,<br><br>    vs.<br><br>BENNETT COUNTY HOSPITAL AND<br>NURSING HOME,<br><br>                    Defendant. | CIV. 16-5077-JLV<br><br>ORDER |

**INTRODUCTION**

Plaintiffs Joyce Riggs and Alfred Riggs filed a multi-count complaint against the defendant, Bennett County Hospital and Nursing Home, their former employer.   (Docket 1).   They allege unlawful discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12201 ("ADA"), the South Dakota anti-discrimination act, S.D.C.L. Chap. 20-13, and South Dakota common law.   Id. at pp. 1-2.   Defendant denies plaintiffs' claims.   (Docket 6).

Defendant filed a motion for summary judgment, a statement of undisputed material facts with supporting exhibits and a supporting brief. (Dockets 20-22 & 23-1 through 23-37).   Plaintiffs filed a brief in resistance to defendant's motion, together with a response to defendant's statement of undisputed facts and plaintiffs' statement of undisputed material facts with a supporting exhibit.   (Dockets 27-28 & 29-1).   Defendant filed a reply brief in

support of its motion, together with defendant's response to plaintiffs' statement of undisputed material facts with a supporting exhibit.  (Dockets 30-31 & 32-1).  For the reasons stated below, defendant's motion for summary judgment is granted in part and denied in part.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Id. at p. 248.  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.  Id.  However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a

2

sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at p. 323.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at pp. 251-52.

## UNDISPUTED MATERIAL FACTS

The following recitation consists of the material facts developed from the complaint (Docket 1 at pp. 2-13), defendant's answer (Docket 6), the parties' statements of undisputed material facts (Dockets 22 & 28 at pp. 12-14), the parties' responses to the opposing party's statements of undisputed material facts (Dockets 28 & 31) and other evidence where indicated.[1] Where a statement of fact is admitted by the opposing party, the court will only

---

[1]The court quotes from the parties' submissions without quotation marks, unless indicated.

reference the initiating document. These facts are "viewed in the light most favorable to the [party] opposing the motion." <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587. The facts material to defendant's motion for summary judgment are as follows.

Joyce Riggs began working at the Bennett County Hospital and Nursing Home ("Bennett County") in 2006. (Docket 22 ¶ 1). Joyce's husband, Alfred Riggs, was also employed by Bennett County as the ambulance director. <u>Id.</u> ¶ 2. Joyce worked as a dietary aide, purchasing-central supply-accounts payable clerk, medication aide-certified nursing assistant, and an emergency medical technician ("EMT") during her tenure at Bennett County. <u>Id.</u> ¶ 3. During her employment, Joyce received reprimands for poor work performance, including: acting outside her scope of practice, unacceptable conduct, inappropriate communication with others, engaging in inappropriate behavior with a male nurse, and criticizing other staff members. <u>Id.</u> ¶ 4. During the time period immediately preceding Joyce's termination, she worked in central supply, Monday through Friday, and served as an on-call EMT for the Bennett County ambulance service. <u>Id.</u> ¶ 5. Some of Joyce's primary responsibilities in central supply included receiving goods, stocking shelves, recording delivery of supplies, sterilizing all sterile supplies and medical waste disposal. <u>Id.</u> ¶ 7.

The central supply room is where all sterile patient supplies were maintained.[2]

Id. ¶ 6. Joyce was responsible for maintaining her work area in a clean manner, using the sterilizer machine, preparing invoices and maintaining inventory. Id. ¶ 8.

Throughout her employment, Joyce regularly brought her dogs to work, namely: "Katie," a Catahoula, "Peabody," a miniature Dachshund, and "Cheikah," a Dalmatian-Bluetick Coonhound.[3] Id. ¶ 9. Joyce's dogs were rarely restrained and often urinated throughout Bennett County's facilities.[4]

Id. ¶ 10. Lynn Ward, a registered nurse, documented the following:

> As a floor nurse on the hospital side prior to my present position, I had many encounters with Joyce Riggs and her dogs in the facility. I had requested to Joyce that she keep her dogs out of the hospital side of the facility while I was working as I had numerous times

---

[2]Plaintiffs object that this statement is not presented in an admissible form. (Docket 28 ¶ 6). Ethel Martin is a registered nurse with more than 40 years of work experience and is qualified to make the declaration from which this statement of facts originated. (Docket 23-22 at pp. 1 & 4). Plaintiffs do not challenge the statement as inaccurate. See D.S.D. Civ. LR 56.1(D) ("All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts."). Plaintiffs' objection is overruled.

[3]Plaintiffs object to this statement on the basis Alfred lacked personal knowledge and there is insufficient foundation for the statement to be admissible. (Docket 28 ¶ 9). Plaintiffs do not challenge the statement as inaccurate. D.S.D. Civ. LR 56.1(D). Plaintiffs' objection is overruled.

[4]Plaintiffs object to this statement on the basis Alfred lacked personal knowledge and there is insufficient foundation for the statement. (Docket 28 ¶ 10). Plaintiffs do not challenge the statement as inaccurate. D.S.D. Civ. LR 56.1(D). Plaintiffs' objection is overruled.

cleaned up dog urine from the floor, and didn't feel it was appropriate in an acute care setting. The dogs were often found running in the hallway or down the passage to the nursing home. The dogs were seldom on a leash.[5]

Id. ¶ 11. Registered nurse Jennifer Risse, the director of nursing in the nursing home side of Bennett County, noted "there were a number of times where I witnessed Joyce Riggs bringing her dogs to work with her. The dogs were never restrained and would run freely throughout the hospital."[6] Id. ¶ 12; see also Docket 23-30 at pp. 3:7-8:7[7] In a 2012 memorandum, RN Risse wrote:

[Cheikah] was friendly enough and some of the residents did enjoy her. The issue became that [Joyce] would not follow the policy and keep her dog restrained or out of the dining area. The dog would wander freely in and out of resident rooms and at times had an issue of getting excited and urinating on the floor. This was not only an Infection Control issue, but also a safety issue for our residents.[8]

Id. ¶ 13. Joyce's supervisor, Katie Dillon, cleaned up urine from all three dogs

---

[5]Plaintiffs object to this statement on the basis RN Ward lacked personal knowledge and there is insufficient foundation for the statement. (Docket 28 ¶ 11). RN Ward's statement is based on her own personal observations. Plaintiffs' objection is overruled.

[6]Plaintiffs object to this statement on the basis no witness had personal knowledge to support the statement and it lacks foundation. (Docket 28 ¶ 12). RN Risse's statement is based on her personal observations. Plaintiffs' objection is overruled.

[7]The court cites to the transcript pages as they appear in CM/ECF, not to the transcript page numbers.

[8]See footnote 6, except the reference is to Docket 28 ¶ 13. Plaintiffs' objection is overruled.

as well as Peabody's bowel movements.[9]  Id. ¶ 14.   Ms. Dillon reported "[o]ne

incident happened with the Catahoula [Katie] where she was afraid and voided

on an upholstered chair down by the emergency/x-ray area.   Joyce spent quite

awhile [sic] shampooing upholstery that day."[10]   Id. ¶ 15.

Alfred admitted Joyce's dogs were not always restrained, "there were

some times I did not see a leash, but they were always with Joyce or they were–

you know, may not necessarily be right beside her . . . ."  Id. ¶ 16.   Joyce

acknowledged an occasion where one of her dogs ate food off a plate on the

floor in the TV room.   (Docket 23-28 at pp. 19:7-11 & 20:10-20).

Maintenance manager Lenny Allison was upset about the dog eating food off a

resident's plate.   (Docket 22 ¶ 18).   He yelled and kicked at Joyce's dog.   Id.

Mr. Allison and Joyce screamed and swore at each other in the presence of the

residents.   Id.   This incident prompted RN Risse to request the

implementation of a pet policy.   Id.   In June 2012, Bennett County

implemented a "Pet Policy."   Id. ¶ 19; see also Docket 23-9.

_____

[9]Plaintiffs object to this statement on the basis no witness had personal
knowledge to support the statement and it lacks foundation.   (Docket 28
¶ 14).   Plaintiffs acknowledge Ms. Dillon cleaned up urine left by Joyce's dogs.
Id.   Plaintiffs' objection is overruled.

[10]Plaintiffs object to this statement on the basis no witness had personal
knowledge to support the statement and it lacks foundation.   (Docket 28
¶ 15).   The objection is granted in part and overruled in part.   The court has
not included a statement which constituted speculation on the part of the
declarant.

In August 2012, Ethel Martin became the CEO of Bennett County.[11] (Docket 22 ¶ 22).  Ms. Martin, formerly Ethel Frein, had been an employee of Bennett County since 1999.  (Docket 1 ¶ 7).  In September 2012, CEO Martin implemented a "Pet Visitation Policy."  (Docket 22 ¶ 24; see also Docket 23-100.  The Pet Visitation Policy allowed pets to be in Bennett County's facilities only for visitation purposes and restricted pets from the dining area, food preparation areas, laundry, supply storage areas, medication preparation areas and isolation areas.  (Docket 22 ¶ 25).  The policy required that at all times the animals must be supervised and restrained on a leash.  Id. ¶ 26.

On November 29, 2012, Joyce was suspended for the afternoon and the next day as the result of a conflict with another employee.[12]  Id. ¶ 33.  Later that day, Joyce attempted suicide.  Id. ¶ 35.  She was transported to the Rapid City Regional Hospital ("RCRH").  Id. ¶ 36.  Her RCRH medical records

---

[11]Plaintiffs object to this statement as coming from an inadmissible pleading.  (Docket 28 ¶ 22).  The pleading in question is plaintiffs' complaint (Docket 1 ¶ 11) to which defendant had no objection (Docket 6 ¶ 11).  See Fed. R. Civ. P. 8(b)(6) ("An allegation . . . is admitted if . . . the allegation is not denied."  Plaintiffs acknowledge "the statement is undisputed."  (Docket 28 ¶ 22).  Plaintiffs' objection is overruled.

[12]Plaintiffs object to the specific content of defendant's statement of undisputed material facts as not being based on personal knowledge, without foundation and constituting inadmissible hearsay.  (Docket 28 ¶ 33).  Without waiving their objection, plaintiffs acknowledge the statement is undisputed but claim the statement is not material.  Id.  The court finds the specific content of the statement is not material, but the incident is necessary to provide context for subsequent events.  Plaintiffs' objection is granted in part and denied in part.

charted an assessment of "[m]ajor depressive disorder, recurrent, severe without psychotic features" and "[r]ule out posttraumatic stress disorder" ("PTSD"). Id.; see also Docket 23-16 at p. 4. The discharge summary on December 2, 2012, contained the same two assessments. (Docket 22 ¶ 37; see also Docket 23-17 at p. 1).

When Joyce returned to work, CEO Martin and Ms. Dillon met with Joyce to follow-up on her suspension and to ensure she was able to return to work.[13] Id. ¶ 38. CEO Martin instructed Joyce to let Ms. Dillon know if Joyce was having a bad day and she would be allowed to go home.[14] Id. ¶ 39.

Joyce had no write-ups or outbursts for the remainder of 2012 and 2013, despite not having her dogs at work with her. Id. ¶ 40. During this period Joyce never left work because she was having a bad day. Id. Joyce met all the necessary requirements to perform the essential functions of her job and performed those duties and responsibilities from 2012 until November 2014, even though Cheikah was not with her at work during this period. (Docket 22 ¶ 54).

---

[13]Plaintiffs object to this statement on the basis no witness had personal knowledge to support the statement and it lacks foundation. (Docket 28 ¶ 38). Plaintiffs acknowledge "the statement is undisputed." Id. Plaintiffs' objection is overruled.

[14]Plaintiffs object to this statement on the basis no witness had personal knowledge to support the statement and it lacks foundation. (Docket 28 ¶ 39). Plaintiffs acknowledge "the statement is undisputed." Id. Plaintiffs' objection is overruled.

Sometime in late October or early November 2014, CEO Martin took a leave of absence for medical purposes. (Docket 1 ¶ 27). During this time period Joyce made a request of Ms. Dillon to permit Cheikah to come to work with her. Id. ¶ 28. Through a series of staff communications, CEO Martin advised Bennett County Chief Financial Officer ("CFO") Judy Soderli that some research needed to be completed on Joyce's request. (Docket 1 ¶ 31). CEO Martin concluded Bennett County had no policy regarding a request for an accommodation of service animals on the premises. Id. ¶ 34.

On November 3, 2014, Joyce requested that Cheikah be allowed to come to work with her as her "service dog" as a reasonable accommodation.[15] (Docket 22 ¶ 41; see also Docket 23-32 at pp. 1 & 39). In support of her request, Joyce provided a "US Service Dog" certificate which she purchased online. (Dockets 22 ¶ 43; 23-12 & 23-13). Joyce believed Cheikah was her "service dog" by virtue of this certificate. (Docket 22 ¶ 46). Joyce indicated the request to bring Cheikah to work was an ADA request for a reasonable accommodation. Id. ¶ 47. Joyce did not request an accommodation to permit Cheikah to accompany her on the ambulance. (Dockets 22 ¶ 42 & 28 ¶ 42).

---

[15]Plaintiffs object to this statement as inadmissible hearsay and failing to acknowledge a finding of the South Dakota Division of Human Rights ("SDDHR") Determination of Probable Cause. (Docket 28 ¶ 41) (referencing Docket 23-32 at p. 39). The Determination of Probable Cause contains the following declaration: "Ms. Martin testified that [Joyce] requested reasonable accommodation for her disability on or about November 3, 2014 and January 13, 2015[,] and [Joyce] does not dispute this." (Docket 23-32 at p. 39). Plaintiffs' objection is overruled.

On November 6, 2014, CEO Martin instructed Ms. Dillon to tell Joyce that Bennett County did not have a service dog policy, but that they were creating a policy.  Id. ¶ 39.  Pending that process, Bennett County asked Joyce to abide by the pet policy currently in place.  Id.  Ms. Dillon was instructed to ask Joyce if she was requesting a reasonable accommodation. Id. ¶ 38.

On December 2, 2014, CEO Martin met with Joyce and asked how she could function on the ambulance crew when working in the office appeared to be stressful.  (Docket 22 ¶ 41).  CEO Martin expressed concern about what would be done with Joyce's dog when Joyce was required to respond to an ambulance call.  Id. ¶ 42; see also Dockets 6 ¶ 42 and 22 ¶ 42.  Joyce responded that she wanted Ms. Dillon to take care of Cheikah during ambulance service calls.[16]  (Docket 22 ¶ 42; see also Docket 6 ¶ 42).

On December 5, 2014, Joyce was given a copy of Bennett County's reasonable accommodation policy, together with a medical inquiry form in support of a reasonable accommodation.[17]  (Docket 1 ¶ 43).  Joyce was asked to have her medical provider fill out the form to ascertain what disability she had and what reasonable accommodation was necessary.  (Docket 22 ¶ 48).

---

[16]Plaintiffs object to this statement as not being made upon personal knowledge and lacking foundation.  (Docket 28 ¶ 42).  Plaintiffs acknowledge "this fact is undisputed."  Id.  Plaintiffs' objection is overruled.

[17]The reasonable accommodations policy appears in the record as Docket 23-19.

On January 5, 2015, Lyle P. Christopherson, DO, Joyce's psychiatrist, completed the form. (Dockets 1 ¶ 44; 22 ¶ 49 & 26 at p. 2). To the question "[d]oes the employee have a physical or mental impairment?" Dr. Christopherson checked "[y]es." (Docket 23-20 at p. 1). He identified "the impairment or the nature of the impairment" as "[d]pression & PTSD." Id.

The introduction to the second question contained the following:

> Answer the following question based on what limitations the employee has when . . . her condition is in an active state and what limitations the employee would have if no mitigating measures were used. Mitigating measures include things like medication, medical supplies, equipment, hearing aids, mobility devices, the use of assistive technology, reasonable accommodations or auxiliary aids or services, prosthetics, learned behavioral or adaptive neurological modifications, psychotherapy, behavioral therapy, and physical therapy. Mitigating measures do not include ordinary eyeglasses or contact lenses.

Id. Following this introduction, the second question was "[d]oes the impairment substantially limit a major life activity as compared to most people in the general population?" to which Dr. Christopherson answered "[y]es." Id. When asked to "[d]escribe the employee's limitations when the impairment is active," Dr. Christopherson wrote "mood fluctuation." Id. When asked "what major life activity(s) (includes major bodily functions) is/are affected?" Dr. Christopherson wrote "n/a." Id. When asked to identify the "[m]ajor bodily functions," Dr. Christopherson wrote "n/a." Id.

The form included three "[q]uestions to help determine whether an accommodation is needed." Id. at p. 2. The preamble to the questions was:

"[a]n employee with a disability is entitled to an accommodation only when the accommodation is needed because of the disability."   Id.   Dr. Christopherson answered the following questions:

1.    What limitation(s) is interfering with job performance or accessing a benefit of employment?

      Companion dog

2.    What job function(s) or benefits of employment is the employee having trouble performing or accessing because of the limitation?

      all

3.    How does the employee's limitation(s) interfere with his/her ability to perform the job function(s) or access a benefit of employment?

      Marked [increase] in depression when dog was banned

Id.; see also Docket 22 ¶ 50.

The final two questions were "to help determine effective accommodation options."   (Docket 23-20 at p. 2).   The preamble to those two questions stated:

If an employee has a disability and needs an accommodation because of the disability, the employer must provide a reasonable accommodation, unless the accommodation poses an undue hardship.   The following questions may help suggest effective accommodations.

Id.   Dr. Christopherson answered the following questions:

1. Do you have any suggestions regarding possible accommodations to improve job performance?   If so what are they?   Let her have her dog back.

2. How would your suggestions improve the employee's job performance?  <u>See 1 above</u>.

<u>Id.</u>

While Cheikah was not specifically trained by an outside service, Joyce personally trained Cheikah "for PTSD/obedience."  (Docket 28 ¶ 52; <u>see</u> <u>also</u> Docket 22 ¶ 52).  Joyce contends that to prevent her from going into an anxiety attack Cheikah would get in front of Joyce, look at her and whine. (Docket 28 ¶ 52).  If Joyce ignores this response, Cheikah will jump up on Joyce, take her to the door and according to Joyce, prevent her from going into an anxiety attack.  <u>Id.</u>; <u>see</u> <u>also</u> Docket 28 ¶ 53).

On January 13, 2015, Alfred delivered to CEO Martin Joyce's formal reasonable accommodation request together with the completed medical inquiry form.  (Docket 1 ¶ 48).  CEO Martin understood Joyce was making a reasonable accommodation request.  (Docket 23-30 at p. 7:20-22).  The next day, CEO Martin spoke with Joyce, acknowledged receipt of the documents and indicated the reasonable accommodation committee would try to meet the following week.  (Docket 1 ¶ 49).

Joyce requested CEO Martin meet with Joyce, Dr. Christopherson and Joyce's therapist to discuss bringing Cheikah to work as her service dog. (Docket 28 at p. 13 ¶ 8).  CEO Martin refused to attend such a meeting. (Docket 29-1 at p. 3:16-4:1).

On January 21, 2015, the reasonable accommodation committee composed of CEO Martin, CFO Soderli and Ms. Dillon met to consider Joyce's accommodation request.  (Docket 1 ¶ 51).  Along with other facts and circumstances,[18] the committee reviewed Joyce's job description, her two most recent performance evaluations, her attendance record, considered whether she had received any verbal or written warnings over the past year, considered whether there were any concerns or complaints which Joyce had made to her supervisor concerning her ability to perform her duties and considered the medical inquiry form completed by Dr. Christopherson.  Id. ¶ 53; see also Docket 6 ¶ 53.  The committee found no significant changes in Joyce's job duties occurred during the past year, her performance evaluations showed improvements, her attendance record was very good, she had not received any verbal or written warning relating to her job performance over the past year and Joyce had not mentioned any specific stressors.  (Docket 1 ¶ 54).  On January 28, 2015, the committee provided Joyce with its written denial of her request for a reasonable accommodation, that is, to bring Cheikah to work with her.  Id. ¶ 58; see also Dockets 22 ¶ 55 and 23-21.

---

[18]Defendant does not identify other facts or circumstances.  See Docket 6 ¶ 53.

According to CEO Martin, after the request was denied, Joyce's behavior at Bennett County became disruptive and unprofessional.[19]   (Docket 22 ¶ 56). On February 4, 2015, Joyce told Ms. Dillon that Joyce wished CEO Martin would get beaten "so bad she can never do anything to anyone again" and referred to her as a "bitch."[20]   Id. ¶ 57.

On February 26, 2015, Joyce appeared at a meeting of the Bennett County Board of Directors.   (Dockets 1 ¶ 62 & 6 ¶ 62).   Joyce demanded that the Board listen to her complaints about the reasonable accommodation committee.[21]   (Docket 22 ¶ 58).   Because Joyce was not on the agenda, Board President David Jones asked Joyce to follow the appropriate policy and get on the agenda for the following week's meeting.[22]   Id.   Mr. Jones instructed Joyce

---

[19]Plaintiffs object to CEO Martin's statement as self-serving and inadmissible hearsay.   (Docket 28 ¶ 56).   CEO Martin's statement is a sworn affidavit and expresses the declarant's opinion as to Joyce's conduct.   (Docket 23-32 at pp. 1-4).   Plaintiffs' objection is overruled.

[20]Plaintiffs object to Ms. Dillon's statement as inadmissible hearsay and irrelevant to any of Joyce's causes of action.   (Docket 28 ¶ 57).   Ms. Dillon's statement is a sworn affidavit and describes Joyce's statements to the declarant.   (Docket 23-32 at pp. 18-20).   Plaintiffs do not challenge the declarant's statement as inaccurate.   D.S.D. Civ. LR 56.1(D).   Plaintiffs' objection is overruled.

[21]Plaintiffs object on the basis the affidavits of CEO Martin and Board President David Jones are inadmissible hearsay and self-serving.   (Docket 28 ¶ 58).   The affidavits are sworn testimony and Plaintiffs do not challenge the declarants' statements as inaccurate.   D.S.D. Civ. LR 56.1(D).   Plaintiffs' objection is overruled.

[22]See footnote 21.   Plaintiffs' objection is overruled.

16

to follow the steps outlined in the grievance procedure.[23]   Id. ¶ 59.   Joyce stormed out of the room, slammed the door and was heard yelling down the hallway as she left.[24]   Id.

On March 2, 2015, CEO Martin attempted to speak with Joyce about her disrespectful and disruptive attitude and conduct, but Joyce refused to listen.[25]   Id. ¶ 60.   Bennett County terminated Joyce's employment that day. (Dockets 1 ¶ 68 and 6 ¶ 68).   Bennett County's stated reasons for termination included Joyce's continuing insubordination toward the administration, her failing to follow facility policies and her attempts to polarize staff against management through misrepresentation of facts.   (Docket 1 ¶ 69).

On March 11, 2015, Alfred delivered to CEO Martin an envelope addressed to "whom it may concern," containing Joyce's appeal of her termination.   Id. ¶ 72; Docket 6 ¶ 72.   That same day Joyce filed a charge of discrimination with the SDDHR alleging Bennett County discriminated and

---

[23]See footnote 21, except the reference is to Docket 28 ¶ 59.   Plaintiffs' objection is overruled.

[24]See footnote 21.   Plaintiffs' objection is overruled.

[25]Plaintiffs object to CEO Martin's statement as self-serving and hearsay. (Docket 28 ¶ 60).   CEO Martin's statement is a sworn affidavit and expresses the declarant's opinion as to Joyce's conduct.   (Docket 23-32 at pp. 1-4). Plaintiffs do not challenge the statement as inaccurate.   D.S.D. Civ. LR 56.1(D).   Plaintiffs' objection is overruled.

retaliated against her in violation of the ADA by terminating her employment after she requested that Cheikah be allowed at work with her.   (Docket 22 ¶ 63; see also Docket 23-33 at pp. 8-9).

On March 12, 2015, Joyce filed a claim for unemployment benefits with the South Dakota Unemployment Insurance Division ("SDUID").   (Docket 22 ¶ 64.   On March 16, 2015, Bennett County filed its opposition to Joyce's claim for unemployment benefits due to her workplace misconduct.   Id. ¶ 65. On March 18, 2015, CEO Martin received a copy of Joyce's SDDHR charge of discrimination.   (Docket 1 ¶ 78).

On March 18, 2015, Certified Nurse Practitioner ("CNP") Nancy Webb completed a form for the SDUID which indicated Joyce suffered from depression and PTSD.[26]   (Dockets 23-34).   CNP Webb noted she had treated Joyce for these conditions since 2004, with the most recent examination occurring on March 2, 2015.   Id.   CNP Webb referred to Cheikah as Joyce's "[s]ervice dog" which "helps calm at times of anxiety."   (Dockets 28 ¶ 53 & 23-34).

On March 19, 2015, Alfred met with CEO Martin and Bennett County's Human Resources ("HR") Director Melanie Peil.   (Docket 1 ¶ 83).   Alfred asked them to permit Joyce to return to work with the ambulance service.   Id. ¶ 84.

---

[26]The court presumes Dr. Christopherson works with CNP Webb at the Bennett County Community Health Center, a facility not associated with Bennett County.   (Docket 23-34).

CEO Martin told Alfred she could not hire Joyce back into the most stressful department in the facility.   Id. ¶ 85.

On March 26, 2015, SDUID concluded Joyce was disqualified from receiving unemployment insurance benefits.   (Dockets 1 ¶ 86 & 23-32 at p. 15 ¶ 33).   Joyce appealed that decision to the South Dakota Department of Labor and Regulation Unemployment Insurance Appeals Division ("Appeals Division").   Id.

At a meeting on April 7, 2015, CEO Martin chastised Alfred because he had used a Bennett County ambulance to perform personal errands after transporting a patient from Martin, South Dakota to Rapid City, South Dakota. (Docket 1 ¶ 88).   The next day CEO Martin drafted a new Bennett County policy which prohibited staff from using ambulances for personal errands.   Id. ¶ 89; see also Docket 23-35 at p. 14.

On April 20, 2015, a hearing was held before an Appeals Division administrative law judge ("ALJ").[27]   (Docket 22 ¶ 67).   On April 28, 2015, the ALJ entered findings of fact, conclusions of law and an order affirming the decision of the SDUID.   Id. ¶ 70.

---

[27]The hearing was conducted by telephone conference call during which Joyce, Alfred, Shana Rosentrater, CNP Weber, CEO Martin and Ms. Dillon testified.   (Docket 23-32 at p. 12).

Between April and June 2015, CEO Martin received numerous complaints about Alfred's employment performance.[28]  Id. ¶ 71.  Alfred agreed it was a problem for Bennett County not to be able to reach him as the ambulance director when ground transportation was needed.  Id. ¶ 78.  Alfred was terminated on June 2, 2015.  (Docket 1 ¶ 97).  Bennett County's reasons for his dismissal included: substandard performance, insubordination, failing to follow the proper chain of command, overstepping scope of practice and past unauthorized use of the ambulance for personal errands.  Id.

On July 24, 2015, Joyce filed a second charge of discrimination alleging Bennett County retaliated against her by opposing her application for unemployment benefits in violation of the South Dakota Human Relations Act ("SDHRA") ("second charge").  (Docket 22 ¶ 83; see also Docket 23-33 at pp. 1-2).  On the same day, Alfred filed a charge of discrimination with the SDDHR alleging he was retaliated against for "participating and assisting" Joyce in her efforts to enforce her rights under the ADA.  Id. ¶ 84.

On July 31, 2015, the SDDHR issued a determination of probable cause in Joyce's favor on her charge of failure to accommodate and her claim of

---

[28]Plaintiffs object to CEO Martin's statement as self-serving and inadmissible hearsay.  (Docket 28 ¶ 71).  CEO Martin's statement is a sworn affidavit and details the declarant's receipt of complaints from other employees of Alfred's performance.  (Docket 23-35 at pp. 26-29).  The underlying complaints are detailed in sworn affidavits.  Id. at pp. 30-36.  Plaintiffs do not challenge the statements as inaccurate.  D.S.D. Civ. LR 56.1(D).  Plaintiffs' objection is overruled.

retaliatory discharge.   (Dockets 1 ¶ 98 & 22 ¶ 82).   On June 2, 2016, the United States Equal Employment Opportunity Commission ("EEOC") adopted the SDDHR's finding in favor of Joyce on her charges of failure to accommodate and retaliatory discharge and issued a dismissal and notice of right to sue letter.   (Docket 1 ¶ 103).

On December 1, 2015, SDDHR issued a no probable cause determination and dismissed Joyce's second charge.   (Dockets 1 ¶ 104 & 22 ¶ 85).   Joyce appealed the SDDHR's second charge dismissal to the Sixth Judicial Circuit Court in Hughes County, South Dakota.   (Docket 22 ¶ 86).   A circuit court judge affirmed SDDHR's second charge dismissal.   Id. ¶ 87.   Joyce appealed the circuit court decision to the South Dakota Supreme Court.   Id. ¶ 88.   On June 27, 2018, the Supreme Court "remanded [the case] back to [SDDHR] for further proceedings . . . [to] consider [Joyce's] March 2 and March 11 letters, the Hospital's articulated reason for terminating [her], and any evidence of pretext."   Riggs v. Bennett County Hospital and Nursing Home, 915 N.W.2d 156, 161 (S.D. 2018).

The South Dakota Supreme Court also addressed Joyce's claim "that her interruption of the February 26, 2015, board meeting . . . [was a] protected activit[y]."   Id. at 160 n.2.   The court ruled "[w]hile appealing adverse employment action may be protected activity generally, interrupting a board meeting is not."   Id. (referencing Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999) ("Although contesting an unlawful employment practice is

protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace.")).

On December 1, 2015, the SDDHR issued a no probable cause determination on Alfred's charge of discrimination. (Docket 22 ¶ 89). Alfred appealed that adverse decision to the Sixth Judicial Circuit Court in Hughes County, South Dakota. Id. ¶ 90. While Alfred's case was on appeal, on August 9, 2016, the EEOC issued a dismissal and notice of rights with respect to Alfred's charge of discrimination. (Docket 1 ¶ 108). On December 23, 2016, the circuit court reversed and remanded the decision against Alfred back to SDDHR. Id.; see also Docket 23-37 at p. 1. On January 17, 2017, SDDHR issued a second no probable cause determination on Alfred's charge of discrimination. (Dockets 22 ¶ 91 & 23-37 at p. 1). Alfred did not appeal that decision. (Docket 22 ¶ 91).

## ANALYSIS

Bennett County seeks summary judgment as to all of plaintiffs' claims on the following grounds:

1. Joyce is not disabled as defined in the ADA;

2. Joyce's failure to accommodate claim fails because she cannot establish her requested accommodation was reasonable on its face;

3. Joyce's retaliation claim fails because applying for unemployment benefits is not a protected activity under the ADA;

4. Bennett County did not engage in extreme or outrageous conduct to support a claim for intentional infliction of emotional distress; and

5. Alfred's retaliation claim fails because he cannot establish he engaged in protected activities and because Bennett County terminated his employment for a legitimate, nondiscriminatory reason.

(Docket 21 at pp. 1-2).

## I.    AMERICANS WITH DISABILITIES ACT

REASONABLE ACCOMMODATION CLAIM

The ADA prohibits discriminating against a "qualified individual" on the basis of disability.   42 U.S.C. § 12112(a).   A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions" of her job.   42 U.S.C. § 12111(8).   "To establish a claim under the ADA, a plaintiff must show (1) that she is disabled within the meaning of the Act; (2) that she is qualified to perform the essential functions of the job either with or without accommodation; and (3) that she has suffered adverse employment action because of the disability."   Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 948 (8th Cir. 1999).   See also Liljedahl v. Ryder Student Transportation Services, Inc., 341 F.3d 836, 841 (8th Cir. 2003). Termination from employment is an adverse employment action.   Hill v. Walker, 737 F.3d 1209, 1219 (8th Cir. 2013); Cross v. Cleaver, 142 F.3d 1059, 1073 (8th Cir. 1998).

The United States Court of Appeals for the Eighth Circuit interprets the "because of" element of a prima facie ADA discrimination claim as requiring the plaintiff "to present direct or indirect evidence showing a causal link between the adverse employment action and [the] disability." Brown v. City of Jacksonville, 711 F.3d 883, 889 (8th Cir. 2013) (citing Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004)).

A plaintiff bringing a claim under the ADA may survive a motion for summary judgment in two ways. First, if the plaintiff can provide "direct evidence" of discrimination, summary judgment is not appropriate. Griffith, 387 F.3d at 736. "Direct evidence in this context is not the converse of circumstantial evidence . . . . Rather, direct evidence [of discrimination] by 'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion action motivated' the adverse employment action." Id. (citing Thomas v. First National Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)). "Thus, 'direct' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part McDonnell Douglas[29] analysis to get to the jury, regardless of whether [her] strong evidence is circumstantial." Id.

---

[29]McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Second, "if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, [s]he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the McDonnell Douglas analysis, including sufficient evidence of pretext." Id. (referencing Harvey v. Anheuser–Busch, Inc., 38 F.3d 968, 971 (8th Cir. 1994)). Under the McDonnell-Douglas analysis, the plaintiff must establish a *prima facie* case of discrimination by a preponderance of the evidence. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).

If the plaintiff presents a *prima facie* case of disability discrimination, the employer then must show a legitimate, nondiscriminatory reason for the adverse employment action. McDonnell Douglas Corp., 411 U.S. at 802. If the employer establishes a legitimate nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination. Id. at 804. While the burden of production may shift between the plaintiff and the defendant, the plaintiff "retains the burden of persuading the trier of fact that . . . she has been the victim of illegal discrimination . . . ." Cravens v. Blue Cross & Blue Shield of Kansas City, 214 F.3d 1011, 1016 (8th Cir. 2000). "[S]ummary judgment is proper if the plaintiff fails to establish any element of . . . her prima facie case." Id.

The court addresses the elements of Joyce's disability claim in the manner most efficient to resolve defendant's summary judgment motion.

1.    DISABILILTY

"The ADA defines disability as '(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" Fjellestad, 188 F.3d at 948 (citing 42 U.S.C. § 12102(2)). "Major life activities include caring for one's self, performing manual tasks, walking, seeing, hearing, breathing, learning and working." Id. (citing 29 CFR. § 1630.2(i)). "An impairment is 'substantially limiting' if it renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population." Id. at 948-49 (citing 29 CFR § 1630.2(j)(1)(i)-(ii)). "[T]he determination of whether an individual is substantially limited in a major life activity must be made on a case by case basis." Id. at 949.

The 2008 amendments to the ADA made clear that a person is brought under the definition of "disabled" when she is subjected to an adverse employment action "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A); see also Brown, 711 F.3d at 889.

For purposes of analyzing defendant's summary judgment motion, the court finds Dr. Christopherson documented Joyce suffers from a mental impairment that affects her major activities of life. (Docket 28 at p. 12 ¶ 1). He identified PTSD and depression as those mental impairments. (Docket 23-20 at p. 1). Joyce is disabled for purposes of her ADA claim. 42 U.S.C. § 12202(2).

2. REASONABLE ACCOMMODATION

An employee requesting an accommodation must "make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job." Burchett v. Target Corporation, 340 F.3d 510, 517 (8th Cir. 2003). Essential functions of the job are "the fundamental job duties of the employment position the individual with a disability holds . . . ." 29 CFR § 1630.2(n)(1). The employee must show the requested accommodation is "reasonable on its face." U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401 (2002).

"[O]nce the plaintiff makes 'a facial showing that reasonable accommodation is possible,' the burden of production shifts to the employer to show that it is unable to accommodate the employee." Cravens, 214 F.3d at 1016 (citing Benson v. Northwest Airlines, Inc., 62 F.3d 1108, 1112 (8th Cir. 1995) (internal citation omitted). Accommodations are not reasonable if the employer "can demonstrate that the accommodation would impose undue hardship on the operation of the business." 42 U.S.C. § 12112(5)(A). "[T]he

ADA does not require an employer to create a new position to accommodate a disabled employee or to shift the essential functions of the position to other employees." Fjellestad, 188 F.3d at 950. "[A]n employer need not reallocate or eliminate the essential functions of a job to accommodate a disabled employee." Id.

"'[A]n accommodation that would cause other employees to work harder, longer, or be deprived of opportunities is not mandated' under the ADA." Minnihan v. MediaCom Communications Corp., 779 F.3d 803, 813 (8th Cir. 2015). "[A]n employer need not . . . eliminate the essential functions of a job to accommodate a disabled employee." Fjellestad, 188 F.3d at 950.

On November 3, 2014, Joyce made a formal request for an accommodation by asking to be allowed to bring Cheikah to work with her.[30] (Docket 28 at p. 13 ¶ 9). The question then becomes: was Joyce's request for an accommodation reasonable? The court finds this question must be answered in the negative.

By Joyce's own admissions, she wanted Cheikah to accompany her to work, but expected other Bennett County employees to supervise Cheikah

---

[30]For purposes of summary judgment analysis, the court will assume with the assistance of Cheikah, Joyce could perform the essential functions of her position.

while Joyce was on ambulance calls.[31]  Bennett County demonstrated it could not expect other employees to supervise Cheikah in Joyce's absence.  This would "impose an undue hardship on the operation of [Bennett County]." 42 U.S.C. § 12112(5)(A).  Requiring other Bennett County employees to take over supervision of Cheikah is not "reasonable on its face."  U.S. Airways, Inc., 535 U.S. at 401.

Joyce fails to show her requested accommodation was reasonable. Bennett County's motion for summary judgement as to count I is granted. Count I of Joyce's complaint, a failure to accommodate claim under the ADA, is dismissed.

RETALIATORY DISCHARGE CLAIMS

1.  UNLAWFUL DISCHARGE FOR SEEKING AN ACCOMMODATION

In count II of her complaint, Joyce asserts while she was engaged in a protected activity, that is, repeatedly requesting an accommodation for her disability, Bennett County engaged in an unlawful, retaliatory termination of her employment.  (Docket 1 ¶¶ 115-18).

The ADA specifically prohibits retaliation against an employee engaged in a protected activity.  "No person shall discriminate against any individual

---

[31]Because of this analysis, the court concludes it is not necessary to resolve (1) whether Cheikah's training qualified it as a service dog; (2) whether Cheikah's sporadic lack of bladder control while in the building still permitted him to qualify as a service dog; or (3) whether permitting Cheikah to accompany Joyce in the Central Supply room constituted a reasonable accommodation.

because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). "To prove a retaliation claim, a plaintiff must show (1) that . . . she engaged in statutorily protected activity; (2) an adverse employment action was taken against . . . her; and (3) a causal connection exists between the two events." Green v. Franklin National Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006) (internal citations omitted); see also Hill v. Walker, 737 F.3d 1209, 1218 (8th Cir. 2013) (To succeed on an ADA retaliation claim, Joyce must establish "(1) she engaged in a statutorily protected activity, (2) the employer took an adverse action against [her], and (3) there was a causal connection between the adverse action and the protected activity.").

The court already concluded Joyce was engaged in a protected activity when seeking an accommodation for her disability. She was ultimately terminated from her position of employment with Bennett County. Termination from employment is an adverse employment action. Hill, 737 F.3d at 1219. Joyce argues the "evidence of a causal connection" between her seeking an accommodation and her termination "is temporal proximity[.]" Id. She contends the brief period of five days between her appearance before the Bennett County Board of Directors on February 26, 2015, seeking an accommodation from the Board of Directors, and her termination on March 2,

2015, establishes Bennett County terminated her for seeking the accommodation.

Bennett County acknowledges that summary judgment is not appropriate on this element. "Bennett County understands that there may be a genuine dispute between the parties as to the basis of Joyce's termination . . . ." (Docket 21 at p. 19).

Summary judgment on count II, Joyce's ADA retaliatory discharge claim, must be denied.

Before moving to plaintiffs' other claims, the court must point out that compensatory and punitive damages are not available on retaliation claims brought under 42 U.S.C. § 12203.

> [T]he 1991 Civil Rights Act does not expand the remedies available to a party bringing an ADA retaliation claim against an employer and therefore compensatory and punitive damages are not available. A close reading of the plain language of [42 U.S.C.] § 1981a(a)(2) makes it clear that the statute does not contemplate compensatory and punitive damages for a retaliation claim under the ADA. Section 1981a(a)(2) permits recovery of compensatory and punitive damages (and thus expands the remedies available under [42 U.S.C.] § 2000e-5(g)(1) ) only for those claims listed therein. With respect to the ADA, § 1981a(a)(2) only lists claims brought under §§ 12112 or 12112(b)(5). Because claims of retaliation under the ADA (§ 12203) are not listed, compensatory and punitive damages are not available for such claims. Instead, the remedies available for ADA retaliation claims against an employer are limited to the remedies set forth in § 2000e-5(g)(1).

Kramer v. Banc of America Securities, LLC, 355 F.3d 961, 965 (7th Cir. 2004).

See also EECO v. CRST International, Inc., 351 F. Supp. 3d 1163, 1185 (N.D. Iowa 2018) ("The Eighth Circuit Court of Appeals has not opined on whether

retaliation or interference claims may provide the basis for an award of compensatory or punitive damages. Most courts to consider the issue, however, including two district courts within the Eighth Circuit, have followed the Seventh Circuit's rationale in Kramer.") (references omitted).

"In the absence of a right to recover compensatory and punitive damages, plaintiff is entitled only to equitable relief on the retaliation and interference claims. . . . The Court therefore finds that plaintiff is not entitled to a trial by jury on plaintiff's retaliation and interference claims." CRST Int'l, Inc., 351 F. Supp. 3d at 1186 (referencing 42 U.S.C. § 2000e-5(g)(1)).

Joyce's claim for compensatory and punitive damages on her retaliation claim must be dismissed. If the retaliation claim is proven at trial, Joyce's remedies are limited to reinstatement and back pay. At that point, Joyce's retaliation claim remedies will be resolved by a court trial. Id.

2. UNLAWFUL DISCHARGE FOR SEEKING UNEMPLOYMENT BENEFITS

In count III of plaintiffs' complaint, Joyce alleges Bennett County terminated her in retaliation for filing for state unemployment insurance benefits. (Docket 1 at p. 14-15). "A retaliation claim under the ADA . . . requires a but-for causal connection between the employee's assertion of her . . . rights and an adverse action by the employer." Oehmke v. Medtronic, Inc., 844 F.3d 748, 758 (8th Cir. 2016) (citing University of Texas Southwest Medical Center v. Nassar, 570 U.S. 338, 352 (2013)). An ADA retaliation claim follows the same direct evidence or burden-shifting analysis employed in

discrimination claims.   <u>EEOC v. Product Fabricators, Inc.</u>, 763 F.3d 963, 972 (8th Cir. 2014).

"The defense can rebut a retaliation claim by showing a 'non retaliatory reason for the adverse employment action.' "   <u>Green</u>, 459 F.3d at 914 (citing <u>Rheineck v. Hutchinson Tech., Inc.</u>, 261 F.3d 751, 757 (8th Cir. 2001)).   "If the defendant can show a legitimate reason, the plaintiff must show that the given reason was only a pretext for discrimination."   <u>Id.</u> (citing <u>Gilooly v. Missouri Department of Health & Senior Services</u>, 421 F.3d 734, 739 (8th Cir. 2005)).

To assert she was engaged in a protected activity, Joyce is required to make a *prima facie* showing she was engaged in a proceeding under the retaliation provision of the ADA.   <u>Green</u>, 459 F.3d at 914.   Joyce argues <u>Burlington Northern Santa Fe Railway v. White</u>, 548 U.S. 53 (2006), supports her ADA retaliation claim.   (Docket 27 at p. 11).   <u>White</u> involved a Title VII discrimination claim.   <u>White</u>, 548 U.S. at 56.   The "antiretaliation provision" of Title VII "prohibits an employer from 'discriminating against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."   <u>Id.</u> (citing 42 U.S.C. § 2000e-3(a)).   The Supreme Court held "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."   <u>Id.</u> at 67.   "In our view, a plaintiff must show that a reasonable employee would have found the

challenged action materially adverse, "which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Id. at 68 (citing Rochon v. Gonzales, 438 F.3d 1211, 1219 (C.A.D.C. 2006) (quoting Washington v. Illinois Department of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)). "The antiretaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms. . . . It does so by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." Id. (citing Robinson v. Shell Oil Co., 519 U.S. 337, 345 (1997) ("Insofar as § 704(a) expressly protects employees from retaliation for filing a 'charge' under Title VII, and a charge under § 703(a) alleging unlawful discharge would necessarily be brought by a former employee, it is far more consistent to include former employees within the scope of 'employees' protected by § 704(a)."). The Court "phrase[d] the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." Id. at 69.

Joyce also argues Ward v. Wal-Mart Stores, Inc., 140 F. Supp. 2d 1220 (D.N.M. April 19, 2001), supports her position. (Docket 27 at p. 12). In Ward, the court found that Wal-Mart's reason for opposing plaintiff's unemployment benefits application was not based on the only statutory allowed reason: wrongful conduct. Ward, 140 F. Supp. 2d at 1231. Rather, the court found Wal-Mart appealed the application because its "policy at the

time was to appeal all unemployment . . . awards as a matter of course."   Id.

Addressing the pretext element of a retaliation claim, the court found

"[b]ecause Wal-Mart had no legitimate basis for appeal, a reasonable factfinder

could find the company's proffered explanation to be unworthy of credence."

Id. at 1232.   For that reason, the court denied Wal-Mart's motion for summary

judgment on Ward's ADA retaliation claim.   Id.   In Ward, the court concluded

the earlier filing of an EEOC claim by Ward was the "protected activity."   Id. at

1230.   Further, the Ward court focused on the pretextual explanation for Wal-

Mart's opposition to Ward's unemployment benefits award.   The court did not

consider whether the application for unemployment benefits was a protected

activity.   The court finds Ward unpersuasive and it does not provide good

guidance on the issues presented in Joyce's case.

Asserting an unemployment benefits claim is associated with the

economic impact of losing one's job and is not associated with asserting a right

under the ADA.   Whether asserting one's own unemployment compensation

claim or testifying during an administrative hearing on behalf of another

individual seeking unemployment benefits, the conduct is not a protected

activity under the ADA.   See Edwards v. Creeks Mental Health Services, Inc.,

505 F. Supp. 2d 1080, 1093 n.4 (N.D. Okla. 2007) ("[F]iling for unemployment

compensation is not a protected activity under the ADA[.]"); Hamilton v. New

Horizons Home Healthcare Limited Liability Co., No. 1:16-CV-399, 2018 WL

3633951, at *5 (N.D. Ind. July 31, 2018) ("[T]estifying at an administrative

proceeding regarding unemployment benefits is not a protected activity under the ADA. . . . Because Sorah was not engaging in protected activity under the ADA by filing for unemployment—a proceeding completely unrelated to the ADA—the Plaintiff's testimony at the [Indiana Department of Workforce Development] hearing necessarily cannot have been aiding or encouraging Sorah in a protected activity under the ADA."). See also Small v. WW Lodging, Inc., 106 F. App'x 505, 508 (7th Cir. 2004) ("[A]pplying for unemployment benefits is not activity protected under Title VII."); McDonald-Cuba v. Santa Fe Protective Services, Inc., 644 F.3d 1096, 1102 (10th Cir. 2011) ("While we have recognized that an employer's opposition to an unemployment benefits claim may represent an adverse employment action . . .   McDonald–Cuba fails to cite any authority recognizing an application for unemployment benefits, without more, as a form of *protected activity* under Title VII.") ( referencing Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1090-91 (10th Cir. 2007) (emphasis in original)); Gentile v. DES, Properties, Inc., No. 3:08-CV-2330, 2012 WL 2792347, at *7 (M.D. Pa. July 9, 2012) ("The Court finds as a matter of law that [an application for unemployment compensation] do[es] not constitute protected activity under a Title VII retaliation claim."); Dannenbring v. Wynn Las Vegas, LLC, No. 2:12-CV-00007, 2012 WL 3317500, at *3 (D. Nev. Aug. 13, 2012) ("[A]n application for unemployment benefits does not constitute protected activity under Title VII."); Edwards, 505 F. Supp. 2d at 1093 ("[F]iling for unemployment compensation [is] entirely unrelated to Title VII.").

In count III, Joyce claims her application for unemployment benefits was the protected conduct. (Docket 1 ¶ 119). The court finds as a matter of law the filing of a claim for unemployment benefits is not a "protected activity" under the ADA. Joyce's retaliation claim under the ADA fails. Green, 459 F.3d at 914.

Joyce's retaliation claim fails for another reason. In Riggs, the South Dakota Supreme Court found:

> [T]he filing of [Joyce's] first charge of discrimination on March 16 could not have had any causal connection to the Hospital's decision to oppose her unemployment-insurance claim until the Hospital received notice of that charge on March 18. But [SDDHR] found that the Hospital's opposition to [Joyce's] unemployment-insurance claim occurred before the Hospital received notice of [her] first charge of discrimination. A review of the record does not create a definite and firm conviction that this finding is erroneous.

Riggs, 915 N.W.2d at 160 n.2 (internal citation and quotation marks omitted). Had the court found filing for unemployment benefits was a protected activity, the undisputed facts in this case show that Bennett County's challenge to Joyce's unemployment claim occurred before she filed the first charge of discrimination. The court finds as a matter of law Bennett County's challenge was neither unreasonable nor connected to the assertion of her ADA rights. Oehmke, 844 F.3d at 758.

Defendant's summary judgment motion as to count III is granted. Count III of plaintiffs' complaint is dismissed.

## II.   INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS

Count IV of plaintiffs' complaint alleges Bennett County "engaged in extreme and outrageous conduct" and "either intentionally or recklessly caused Joyce . . . to suffer extreme and disabling emotional distress."   (Docket 1 ¶ 123).   In this count, Joyce alleges:

> ]Bennett County] repeatedly rejected [Joyce's] requests that [Bennett County] accommodate her disability, delaying its responses to her accommodation requests, insulting and demeaning her when she demonstrated symptoms of depression, forcing Joyce to take unnecessary action to present her requests, rejecting her requests despite medical documentation validating her claim, retaliating against her by terminating her employment, further retaliating against her by opposing her claim for unemployment insurance benefits in bad faith, and further retaliating against her by terminating her husband.

Id.

This is a state law claim.   "[A] federal court exercising supplemental jurisdiction [over state-law claims] is bound to apply the substantive state law governing the claims."   Emmenegger v. Bull Moose Tube Co., 324 F.3d 616, 624 n.9 (8th Cir. 2003).

In South Dakota, to prevail on an intentional infliction of emotional distress claim a plaintiff must prove the following:

(1)   [A]n act by the defendant amounting to extreme and outrageous conduct;

(2)   [I]ntent on the part of the defendant to cause the plaintiff severe emotional distress;

<blockquote>

(3)    [T]he defendant's conduct was the cause-in-fact of plaintiff's distress; and

(4)    [T]he plaintiff suffered an extreme disabling emotional response to defendant's conduct.

</blockquote>

Estate of Johnson by and through Johnson v. Weber, 898 N.W.2d 718, 726 (S.D. 2017) (internal citation omitted). "[T]he tort of intentional infliction of emotional distress includes liability on the part of the defendant for reckless conduct resulting in emotional distress." Id. (citing Petersen v. Sioux Valley Hospital Association, 491 N.W.2d 467, 469 (S.D. 1992)). In Petersen, the South Dakota Supreme Court "specifically [found] that the tort of intentional infliction of emotional distress encompasses liability for reckless infliction of emotional distress . . . ." Petersen, 491 N.W.2d at 469.

"Proof under this tort must exceed a rigorous benchmark." Estate of Johnson by and through Johnson, 898 N.W.2d at 726 (internal citation omitted). "For conduct to be 'outrageous,' it must be so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (internal citation omitted). "The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is particularly susceptible to emotional distress by reason of some physical or mental condition or peculiarity." Ruane v. Murray, 380 N.W.2d 362, 364 (S.D. 1986) (citing Restatement (Second) of Torts § 46, Comment f (1965)). "The requirement that the conduct be extreme and outrageous reflects [the South Dakota Supreme

Court's] concern with the difficulties surrounding proof of the existence of severe emotional harm, and proof of a causal relationship between the injury and the defendant's conduct. If the conduct is gross and extreme it is more probable that the plaintiff did, in fact, suffer the emotional distress alleged." Tibke v. McDougall, 479 N.W.2d 898, 907 (S.D. 1992). The South Dakota Supreme Court applies this standard because "the requirement of extreme and outrageous conduct as a condition of recovery will avoid litigation 'in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than law.' " Id. (internal citation omitted).

"The question whether the defendant's conduct was extreme and outrageous is initially for the trial court." Estate of Johnson by and through Johnson, 898 N.W.2d at 726 (internal citation omitted). See also Tibke, 479 N.W.2d at 907 ("The determination of outrageous conduct by the defendant is initially for the court."); Christensen v. Quinn, 45 F. Supp. 3d 1043, 1091 (D.S.D. 2014) ("Whether conduct is 'extreme enough to permit recovery' is a question of law.") (citing Reeves v. Reiman, 523 N.W.2d 78, 83 (S.D. 1994)).

"The tort of intentional infliction of emotional distress requires no proof of physical injury or actual pecuniary loss." Henry v. Henry, 604 N.W.2d 285, 288 (S.D. 2000). The conduct must, however, be "calculated to cause, and does cause, mental distress of a very serious kind." Tibke, 479 N.W.2d at 907 (internal citation omitted). "It has not been enough that the defendant has

acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." <u>Christensen</u>, 45 F. Supp. 3d at 1091 (citing <u>Restatement (Second) of Torts</u> § 46 cmt. d (1965)).

Joyce asserts Bennett County's "conduct was extreme and outrageous." (Docket 27 at p. 14). The court already found Joyce's request for an accommodation was not reasonable.[32] The undisputed facts articulated earlier in this order do not comport with Joyce's argument that Bennett County "obstructed [her] attempts to even get on the board meeting agenda."[33] Finally, the court concluded Bennett County's resistance to Joyce's unemployment claim was neither unreasonable nor a violation of the ADA.[34]

The court finds that reasonable minds could not differ and as a matter of law the decisions of Bennett County were neither extreme nor outrageous conduct nor was the conduct "calculated to cause . . . mental distress of a very serious kind." <u>Tibke</u>, 479 N.W.2d at 907. <u>See</u> <u>also</u> <u>Christensen</u>, 45 F. Supp. 3d at 1091 (defendant's "actions, while questionable, possibly tortious, and found by [a magistrate judge] to be unconstitutional, do not go beyond all

---

[32]<u>Supra</u>, at p. 29.

[33]<u>Compare</u>, <u>supra</u>, at p. 16-17 and Docket 27 at p. 14.

[34]<u>Supra</u>, at p. 38.

possible bounds of decency.   The rigorous benchmark has not been met in this case, and all defendants are entitled to summary judgment on [the intentional infliction of emotional distress claim].”); Groseth International, Inc., v. Tenneco, Inc., 410 N.W.2d 159, 169 (S.D. 1987) (“The trial court did not find any evidence of unreasonable conduct by [defendant] or any evidence that [defendant’s conduct] was intended or calculated to cause any mental distress.”).

Bennett County is entitled to summary judgment on Joyce’s intentional infliction of emotional distress claim.   Count IV of plaintiffs’ complaint is dismissed.

## III.    ALFRED’S CLAIMS

### 1.   THIRD-PARTY RETALIATION

Count V of plaintiffs’ complaint asserts a third-party retaliation claim against Bennett County because it terminated Alfred “as a means of further retaliation against Joyce[.]”   (Docket 1 ¶ 126).   Alfred alleges Bennett County violated his “rights under 42 U.S.C. § 12203[a][35] and S.D.C.L. § 20-13-26.” Id. ¶ 127.

Under the participation clause of the ADA, an employer is prohibited from discriminating against an individual who has “assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.”

---

[35]The court believes plaintiffs intended to reference 42 U.S.C. § 12203(a), the participation clause of the ADA.

42 U.S.C. § 12203(a). "[T]he purpose of Title VII is to protect employees from their employers' unlawful actions." <u>Thompson v. North American Stainless, LP</u>, 562 U.S. 170, 178 (2011). "[A] plaintiff may not sue unless he falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." <u>Id.</u> at 177 (internal quotation marks and citation omitted). The Court "described the 'zone of interests' test as denying a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." <u>Id.</u> at 178 (internal quotation marks and citation omitted). "We hold that the term 'aggrieved' in Title VII incorporates this test, enabling suit by any plaintiff with an interest arguably sought to be protected by the statute . . . while excluding plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in Title VII." <u>Id.</u> at 178-179 (internal quotation marks, brackets and citation omitted).

The EEOC "counsels that Title VII 'prohibits retaliation against someone so closely related to or associated with the person exercising . . . her statutory rights that it would discourage or prevent the person from pursuing those rights.'" <u>Id.</u> at 179 (J. Ginsberg, concurring) (quoting EEOC *Compliance Manual* § 8–II(C)(3) (1998) (internal reference omitted). "Such retaliation 'can be challenged . . . by both the individual who engaged in protected activity and the relative, where both are employees.'" <u>Id.</u> (quoting *Compliance Manual* § 8–II(B)(3)(c) (internal reference omitted).

"At a minimum there would have to be factual allegations of discrimination against a member of a protected group and the beginning of a proceeding or investigation under Title VII."  Brower v. Runyon, 178 F.3d 1002, 1006 (8th Cir. 1999).  "An inference of retaliatory motive may be supported by evidence that the defendant was aware of protected activity and that the date of the adverse employment action closely followed such activity." Id.  The retaliation clause exists to "protect proceedings and activities which occur in conjunction with or after the filing of a formal charge with the [EEOC]."  EEOC v. Total Systems Services, 221 F.3d 1171, 1174 (11th Cir. 2000).  See also Hatmaker v. Memorial Medical Center, 619 F.3d 741 (7th Cir. 2010):

> The participation clause prohibits retaliation against an employee who has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. A purely internal investigation does not involve a charge, or testimony, and neither is it a proceeding or a hearing.  To bring an internal investigation within the scope of the clause we would have to rewrite the statute.  We therefore join the courts that interpret the participation clause as being limited to official investigations.

Id. at 747 (internal quotation marks omitted) (referencing Total System Services, Inc., 221 F.3d at 1174; Brower, 178 F.3d at 1006; Vasconcelos v. Meese, 907 F.2d 111, 113 (9th Cir. 1990)).

A plaintiff may assert a claim for retaliation even where the underlying claim for disability discrimination fails.  All that is required is that Joyce held

a good faith belief that her requested accommodation was appropriate.   Heilser
v. Metropolitan Council, 339 F.3d 622, 632 (8th Cir. 2003).

"The plaintiff's ultimate burden in a Title VII retaliation case is to prove
an impermissible retaliatory motive was the 'but-for cause' of the adverse
employment action."   Donathan v. Oakley Grain, Inc., 861 F.3d 735, 739 (8th
Cir. 2017) (citing University of Texas Southwestern Medical Center, 570 U.S. at
360 ("Title VII retaliation claims must be proved according to traditional
principles of but-for causation . . . . This requires proof that the unlawful
retaliation would not have occurred in the absence of the alleged wrongful
action or actions of the employer.").   "[T]emporal proximity serves as . . . strong
evidence of causation . . . ."   Id. at 741.

Bennett County argues Alfred acknowledged only engaging in two
activities to assist Joyce in her first charge of discrimination.   (Docket 21 at
p. 38-40).   According to Bennett County those were: (1) taking pictures of the
doors at Bennett County, which Joyce was accused of slamming on her way
out of a meeting of the Board of Directors of Bennett County; and (2) attending
Joyce's unemployment benefits hearing.   Id. at p. 38.

Alfred submits he "has presented sufficient facts in the record to
demonstrate that he participated in a protected activity."   (Docket 27 at p. 16).
Alfred argues "[h]e assisted Joyce with her attempts to have [Bennett County]
accommodate Joyce's disability."   Id.   The conduct Alfred identifies within his
course of "protected activity" was: delivering letters to the Bennett County

board members; taking pictures of the doors; trying to persuade Bennett County to allow Joyce to return to ambulance duty after her termination; and assisting Joyce with her unemployment benefits claim.   Id.   Alfred asserts because he was fired "within a matter of weeks," this "temporal proximity tends to show his termination was caused by his participation in a protected activity rather than legitimate reasons."   Id.

From the undisputed factual summary above, Alfred's activities related to Joyce's ADA discrimination claim were the following:[36]

> On January 13, 2015, Alfred delivered Joyce's accommodation request together and the completed medical inquiry form to CEO Martin.   (Docket 1 ¶ 48).

> On March 2, 2015, Alfred delivered copies of Joyce's termination grievance appeal to the members of the Board of Directors of Bennett County.   Id. ¶ 66.

> On March 11, 2015, Alfred delivered to CEO Martin an envelope addressed to "whom it may concern," containing Joyce's appeal of her termination.   (Dockets 1 ¶ 72 & 6 ¶ 72).   Alfred also e-mailed CEO Martin asking her to reconsider the decision to not permit Joyce to work as an EMT on the ambulance crew.   (Docket 1 ¶ 73).

---

[36]On February 26, 2015, Joyce appeared at a meeting of the Bennett County Board of Directors.   (Dockets 1 ¶ 62 & 6 ¶ 62).   When instructed to follow the proper grievance procedure Joyce stormed out of the room, slamming the door.   (Docket 1 ¶ 59).   Albert later took pictures of the door to show that anyone could be accused of slamming the door because it closed so easily.   It is unclear when this activity occurred or how Alfred believes it is related to Joyce's ADA claim.   Taking these photographs does not rise to the level of proof of his assistance to Joyce or his participation in her ADA discrimination claim.   Thompson, 562 U.S. at 178.

Joyce filed her first Charge of Discrimination on March 11, 2015, with SDDHR. While an employee of Bennett County, Alfred's activities undertaken to support his wife do not rise to the level of assistance or participation contemplated by § 12203(a). These *de minimus* activities and Alfred's interest in supporting Joyce are "so marginally related to or inconsistent with the purposes implicit in [42 U.S.C. §12203(a)] that it cannot reasonably be assumed that Congress intended to permit" him to assert a retaliation claim on these facts. Thompson, 562 U.S. at 178.

Alfred's support of Joyce after March 11, 2015, does not fare any better. On March 19, 2015, Alfred met with CEO Martin and HR Director Peil. Alfred asked if Joyce could continue to work for the Bennett County ambulance service. This single conversation is only marginally related, at best, to Joyce's ADA claim and "it cannot reasonably be assumed that Congress intended to permit" him to assert a retaliation claim based on this isolated fact. Id.

While Alfred's conversation with CEO Martin and HR Director Peil occurred after Joyce's Charge of Discrimination, his effort to get Joyce at least partial re-employment is far removed from his termination on June 2, 2015. Alfred fails to satisfy his burden at this stage to show that his single conversation with these Bennett County officials was the "but-for cause" of his termination. Donathan, 861 F.3d at 739.

Alfred's third-party retaliation claim fails for another reason. The justification for Alfred's termination on June 2, 2015, according to Bennett

County included: substandard performance, insubordination, not following the proper chain of command, overstepping the scope of his practice or authority and past unauthorized use of the ambulance for personal errands. Because Bennett County has shown legitimate reasons for terminating Alfred, he "must show that the given reason[s were] only a pretext for discrimination." Green, 459 F.3d at 914.

The court is required to "keep in mind that '[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions . . . . Rather, [the court's] inquiry is limited to whether the employer gave an honest explanation of its behavior.' " Wilking v. County of Ramsey, 153 F.3d 869, 873 (8th Cir. 1998) (citing Harvey v. Anheuser-Busch, Inc., 38 F.3d 968, 973 (8th Cir. 1994)). In this process,

> [The] trial judge is allowed to decide on a motion for summary judgment that the evidence is insufficient for a reasonable trier of fact to infer discrimination even though the plaintiff may have created a factual dispute as to the issue of pretext. . . . To demonstrate pretext, a plaintiff must present sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false *and* that discrimination was the real reason. . . . This burden will not be met by simply showing that the reason advanced by the employer was false; rather, [the plaintiff] must demonstrate that a discriminatory animus lies behind the defendants' neutral explanations. . . . Specifically, the plaintiff must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination.

Id. at 874 (internal citations and quotation marks omitted) (emphasis in original).

"[M]ore substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [the employer's] legitimate, non-discriminatory explanation." Jones v. United Parcel Service, Inc., 461 F.3d 982, 992 (8th Cir. 2006). "To succeed at this stage . . . plaintiff[] must prove the prohibited reason was a determinative factor in [the employer's] decision . . . ." Id.

Alfred fails to show pretext. He acknowledges Bennett County had reason to be concerned he was not available by cell telephone service on a 24-hour basis and that his ambulance trips far exceeded the reasonable time period required to transport a patient from Martin, South Dakota, to Rapid City, South Dakota. Further, Bennett County's assertion Alfred overstepped his authority with the medical staff providing health care to patients requiring ambulance transportation to other facilities is unchallenged.

The period between the March 19 conversation and his termination on June 2 also diminishes the probability that the two events were connected. See Kipp v. Missouri Highway & Transportation Commission, 280 F.3d 893, 897 (8th Cir. 2002) ("[T]he interval of two months between the complaint and [plaintiff's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding [of causation].") (some brackets omitted); Brower, 178 F.3d at 1007 (Plaintiff "failed to offer evidence sufficient to support a finding of a causal

connection between this visit and the subsequent adverse employment action.").

Alfred's third-party retaliation claim fails as a matter of law. Defendant's motion for summary judgment on count V is granted. Count V of plaintiffs' complaint is dismissed.

2. RETALIATION

Count VI of plaintiffs' complaint alleges Bennett County "unlawfully retaliated against [Alfred] when it terminated his employment because he assisted and encouraged Joyce . . . in her efforts to enforce her rights [guaranteed by the ADA and the South Dakota Human Relations Act]." (Docket 1 ¶ 130). Alfred's count VI retaliation claim differs from his third-party retaliation claim in that count VI is based on 42 U.S.C. § 12203(b). Id. at 131. That section provides that it is "unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his . . . having exercised or enjoyed, or on account of his . . . having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

"A plaintiff alleging an interference claim under [§ 122023(b)] must show that 1) [Alfred] engaged in activity statutorily protected by the ADA; 2) [Alfred] engaged in, or aided or encouraged [Joyce] in, the exercise or enjoyment of ADA protected rights; 3) [Bennett County] interfered on account of [Alfred's] protected activity; and 4) [Bennett County was] motivated by an intent to

discriminate." CRST Int'l, Inc., 351 F. Supp. 3d at 1181 (referencing Frakes v. Peoria School District No. 150, 872 F.3d 545, 550-51 (7th Cir. 2017) (citations omitted)).

It is not necessary for Joyce to have prevailed on her ADA claim for Alfred to be protected under § 12203(b), "as long as she had a good faith belief that . . . [her] accommodation [request] was appropriate." Heilser, 339 F.3d at 632. For purposes of analysis of Alfred's retaliation claim, the court presumes that Joyce was engaged "in the exercise . . . of [her] ADA protected rights." CRST Int'l, Inc., 351 F. Supp. 3d at 1181.

For the same reasons articulated in analyzing Alfred's third-party retaliation claim, his retaliation claim fails. His single conversation with CEO Martin and HR Director Peil is only marginally related to Joyce's ADA claim and "it cannot reasonably be assumed that Congress intended to permit" him to assert a retaliation claim based on this isolated fact. Thompson, 562 U.S. at 178. No reasonable factfinder could conclude this isolated conversation constituted support of Joyce's ADA accommodation request. Additionally, Alfred has not shown this conversation was temporally connected with his termination three months later. Kipp, 280 F.3d at 897.

Alfred's retaliation claim under § 12203(b) fails as a matter of law. Defendant's motion for summary judgment on count VI is granted. Count VI of plaintiffs' complaint is dismissed.

## IV.    SOUTH DAKOTA ANTI-DISCRIMINATION CLAIMS

Plaintiffs' complaint generally cites South Dakota's Human Rights Act ("SDHRA"), S.D.C.L. Chap. 20-13, as an additional basis in support of their claims.   (Docket 1 p. 1).   Other than this introductory reference, Joyce's causes of action do not reference S.D.C.L. Chap. 20-13.   Id. ¶¶ 110-122. Alfred's retaliation claims specifically reference S.D.C.L. 20-13-26.   Id. ¶¶ 127 & 131.   Plaintiffs' brief in resistance to defendant's motion for summary judgment does not address S.D.C.L. Chap. 20-13.   See Docket 27.

The South Dakota Supreme Court instructs that discrimination claims are to be analyzed under the same framework as claims under Title VII.   Huck v. McCain Foods, 479 N.W.2d 167, 169-70 (S.D. 1991).   See also Alexander v. Avera St. Luke's Hospital, 768 F.3d 756, 765 (8th Cir. 2014) ("In interpreting the SDHRA, the South Dakota Supreme Court has followed federal court decisions construing analogous federal anti-discrimination statutes.") (referencing Huck, 479 N.W.2d at 169-70).   Because plaintiffs' state claims are premised on the same factual bases as their ADA claims, the court resolves plaintiffs' SDHRA claims in the same manner as their ADA claims.

### ORDER

Based on the above analysis, it is

ORDERED that defendant's motion for summary judgment (Docket 20) is granted in part and denied in part.

IT IS FURTHER ORDERED that count I of plaintiffs' complaint, Failure to Accommodate, is dismissed with prejudice.

IT IS FURTHER ORDERED that defendant's motion for summary judgment as to count II of plaintiffs' complaint, Retaliatory Discharge, is granted in part and denied in part. Joyce's claim for compensatory and punitive damages on this claim is dismissed. Joyce's right to relief, if the claim is proven at trial, is limited to reinstatement and back pay. Count II to be resolved by a court trial.

IT IS FURTHER ORDERED that count III of plaintiffs' complaint, Retaliation, is dismissed with prejudice.

IT IS FURTHER ORDERED that count IV of plaintiffs' complaint, Intentional Infliction of Emotional Distress, is dismissed with prejudice.

IT IS FURTHER ORDERED that count V of plaintiffs' complaint, Third-Party Retaliation, is dismissed with prejudice.

IT IS FURTHER ORDERED that count VI of plaintiffs' complaint, Retaliation, is dismissed with prejudice.

IT IS FURTHER ORDERED that plaintiffs' SDHRA claims are resolved in the same manner as the corresponding ADA claims.

Dated March 31, 2019.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
CHIEF JUDGE